#25429-a-DG

**2010 SD 48**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

IN THE MATTER OF THE ESTATE
OF FRED L. BERG, Deceased.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
MEADE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JEROME A. ECKRICH, III
Judge

\* \* \* \*

STEPHEN J. WESOLICK of
Wesolick Konenkamp & Rounds, LLP
Rapid City, South Dakota

JAMISON A. ROUNDS of
Wesolick Konenkamp & Rounds, LLP          Attorneys for appellant
Sioux Falls, South Dakota                 Carol Berg Opdahl.

GREGORY A. EIESLAND
AARON D. EIESLAND
Johnson Eiesland Law Firm, PC             Attorneys for appellee
Rapid City, South Dakota                  Helen Manns.

ROBERT VAN NORMAN of
Nooney, Solay & Van Norman, LLP           Attorneys for appellee
Rapid City, South Dakota                  Great Western Bank.

\* \* \* \*

CONSIDERED ON BRIEFS
ON APRIL 26, 2010

OPINION FILED **06/16/10**

#25429

GILBERTSON, Chief Justice

[¶1.]    In a probate proceeding, contestant Carol Opdahl (Opdahl) unsuccessfully objected to her uncle's will claiming lack of testamentary capacity and undue influence.  We affirm.

## FACTS

[¶2.]     Fred L. Berg was born on July 27, 1919, and died on November 5, 2006, at the age of 87.  He was the youngest of nine children.  Fred grew up in North Dakota and served in the United States Army during World War II.  He was discharged from the Army in 1943 and admitted to hospitals in Washington State and North Dakota due to service-connected schizophrenia.

[¶3.]    Fred was eventually admitted to the Veteran Affairs (VA) Hospital in Fort Meade, South Dakota.  His medical records from 1945 through 1950 indicate he suffered visual and auditory hallucinations.  After several rounds of electro shock therapy, Fred experienced periods of remarkable improvement.  However, he subsequently refused electro shock therapy due to unfounded fears that he had a severe back condition that could be worsened by further treatments.  His medical records indicate several times that his doctors considered him to be incompetent.

[¶4.]    In March 1950, Fred received a bilateral prefrontal lobotomy for unclassified schizophrenia.[1]  His post-operative diagnoses were:  (a) schizophrenic

---

1.    The use of lobotomy on the mentally ill "reached the height of use just after World War II. . . .  At that time, the procedure was viewed as a possible solution to the overcrowded and understaffed conditions in state-run mental hospitals and asylums." http://www.healthline.com/galecontent/psychosurgery (last visited June 8, 2010).  The lobotomy was used frequently on shell-shocked returning World

(continued . . .)

-1-

#25429

reaction, paranoid type, manifested by delusions and auditory hallucinations, peculiar hyperactive behavior, and confusion; and (b) convulsive disorder, grand mal type, probably secondary to bilateral prefrontal lobotomy. Fred received psychotropic medications for the rest of his life including Stelazine for schizophrenia and Dilantin for the convulsive disorder. He gradually improved enough to engage in social and recreational activities, but preferred to be alone.

[¶5.] On July 6, 1950, Fred's parents brought Fred back to North Dakota to live with his sister Helen Manns and her husband on a trial basis.[2] He was, however, unable to function well outside of a care facility due to his tendency to set small fires while smoking. He returned to live at the VA Hospital at Fort Meade.

[¶6.] In 1964, Fred was found to have sufficient "present contact with reality" to try a year of foster care in a private residence that provided housing for disabled veterans. His medical records indicated that he was no longer considered incompetent by his physicians. At the end of a year in foster care, Fred was found well enough to relocate to Ox Yoke Ranch, a residential facility for disabled veterans in Nemo, South Dakota.

_____

(. . . continued)
    War II veterans.
    http://www.pbs.org/wgbh/americanexperience/features/primary-
    resources/lobotomist-introduction/ (last visited June 8, 2010). Eventually, the
    lobotomy was abandoned after long-term studies on the after effects began to
    emerge. *Id*. "For many patients the procedure resulted in a vegetative state,
    or reduced them to a childlike mental faculty." *Id*.

2.    Fred's records indicate he lived with Helen and her husband during high
      school due to some difficulty between Fred and his father.

#25429

[¶7.] On February 1, 1967, the VA declared Fred incompetent under 38 CFR § 3.353. That incompetency was *"limited for purposes of insurance and disbursement of benefits."* *See* 38 CFR § 3.353(b)(i) (emphasis added).[3] No determination was ever made by the VA as to Fred's testamentary capacity under 38 CFR § 3.355.[4]

---

3. A declaration of incompetency under 38 CFR § 3.353 is not binding on this Court on the issue of testamentary capacity. *In re* Estate of Dokken, 2000 SD 9, ¶21, 604 NW2d 487, 493.

4. "A mentally incompetent person is one who because of injury or disease lacks the mental capacity to contract or to manage his or her own affairs, including disbursement of funds without limitation." 38 CFR § 3.353(a). The determination is made by the rating agency, and is limited for purposes of insurance and disbursement of benefits. 38 CFR § 3.353(b)(1).

   Testamentary capacity for purposes of executing designations or changing of beneficiary is determined under 38 CFR § 3.355. That section provides in relevant part:

   > (a) Testamentary capacity is that degree of mental capacity necessary to enable a person to perform a testamentary act. This, in general, requires that the testator reasonably comprehend the nature and significance of his act, that is, the subject and extent of his disposition, recognition of the object of his bounty, and appreciation of the consequence of his act, uninfluenced by any material delusion as to the property or persons involved.
   > . . .
   >
   > (c) Lack of testamentary capacity should not be confused with insanity or mental incompetence. An insane person might have a lucid interval during which he would possess testamentary capacity. On the other hand, a sane person might suffer a temporary mental aberration during which he would not possess testamentary capacity. There is a general but rebuttable presumption that every testator possesses testamentary capacity. Therefore, reasonable doubts should be resolved in favor of testamentary capacity.

(continued . . .)

#25429

[¶8.] After Fred was found incompetent under 38 CFR § 3.353, the VA required the appointment of a guardian as a condition precedent to the receipt of future benefits. On February 28, 1967, a county court order appointed American National Bank & Trust Company (nka U.S. Bank Trust National Association SD) ("U.S. Bank") as guardian. U.S. Bank served as guardian under SDC 1960 § 35.1907 until the relationship was changed to that of a conservatorship by the enactment of the South Dakota Guardianship and Conservatorship Act in 1993. *See* SDCL 29A-5-103. After the 1993 change in the code, a guardian was not appointed for Fred.

[¶9.] Fred remained at Ox Yoke Ranch until it closed in 1991. He was relocated to the nursing home care unit at the VA Hospital at Fort Meade until a proper nursing home placement could be found. A nursing care note in his VA Hospital records dated April 28, 1992, stated that Fred wanted to have his will drawn up. The nursing notes indicated that Fred was competent for purposes of making a will. Fred was referred to an attorney, but nothing in the nursing notes indicated that a meeting took place.

[¶10.] In 1992, Fred moved to the Good Samaritan Center (Good Samaritan) in New Underwood, South Dakota. He resided there until November 29, 1999, when his declining physical state required a higher level of care and he returned to the VA Hospital at Fort Meade. Fred's file indicated an increasing number of falls

_____

(. . . continued)
    38 CFR § 3.355.

-4-

throughout his last three years at Good Samaritan and a progression from a cane to a walker. However, the use of these aids did not improve his gait or balance.

*Relationship with Roger Berg*

[¶11.]     In 1991, Roger Berg (Roger), one of Fred's many nephews, and Roger's son visited Fred at the VA Hospital at Fort Meade while in the Black Hills for a vacation. This was the first time Roger and Fred had seen each other since the two first met in 1961 when Roger was fifteen or sixteen and Fred was visiting his parents on their North Dakota farm. Fred remembered Roger and described for him their meeting in great detail. Fred described the farm layout including what crops were being grown in which fields. Fred also remembered that Roger had left before Fred that day and that Roger had his horse with him. Fred remembered the name of Roger's horse some thirty years later.

[¶12.]     Roger and his son took Fred out to dinner that evening. While in Deadwood, they stopped at a casino because Fred wanted to play Blackjack. Roger observed that Fred was counting points as he played and was surprised that Fred was able to do so faster than Roger could. That evening a friendship began between the two men that lasted until Fred's death.

[¶13.]     After Fred moved to Good Samaritan a few months later, Roger and Fred would see each other one to two times per year almost every year for the next sixteen years. Roger would take Fred out for a few days each time. The two

traveled to the state of Washington to visit Fred's sister, Anne Hunt, and her family.[5] Roger also brought Fred to North Dakota for a Berg family reunion where Fred spent time with his favorite sister, Helen. The two also took trips together in and around the Black Hills. Roger also regularly telephoned Fred at Good Samaritan.

[¶14.]    During the family reunion, Helen and Norma Miedema, one of Fred's nieces and sister to Opdahl and who was then serving as the family contact for Good Samaritan, asked Roger if he would be willing to serve as Fred's attorney-in-fact for health care as well as for financial and business purposes.[6] Roger was honored to do so and on his next visit to see Fred at Good Samaritan, Roger discussed the matter with Fred who agreed it was a good idea. Roger also discussed the power of attorney with Diana Tines, Director of Social Services at Good Samaritan, who would later testify that it was a natural progression of the relationship between the two men as Roger was the only family member who routinely visited Fred.

[¶15.]    In early December 1995, Roger made an appointment for Fred with attorney Tom Foye of the firm of Bangs, McCullen, Butler, Foye and Simmons LLP in Rapid City for the preparation and signing of the power of attorney. On December 21, 1995, during one of Roger's visits, he took Fred to Attorney Foye's

---

5.    It was at this time that Roger became aware that Fred had some money at U.S. Bank, as Roger was able to pay for Fred's airline ticket and then obtain reimbursement from the conservatorship account.

6.    Fred's father, Gilbert Berg, originally had served as the contact for medical providers until Gilbert was confined to a nursing home. A succession of brothers served until their deaths or disabilities, including Leonard Berg, the father of Opdahl, the will contestant in this matter.

office.  Attorney Foye explained to Fred the purpose of a durable power of attorney and a power of attorney for health care purposes.  Fred signed the power of attorney in Roger's presence.  From that time on, Roger received numerous calls from Good Samaritan staff concerning Fred's health issues, medication changes, and other issues for which staff needed Roger's assistance or approval.

[¶16.]    In the spring of 1996, Roger received a copy of an annual conservatorship report from U.S. Bank in his capacity as Fred's attorney-in-fact. He learned for the first time that Fred had a significant amount of money.  Up until that time, Roger and the entire Berg family had been under the impression that Fred was a pauper.  During a family reunion, Fred had mentioned to Roger and another cousin, Kenny, that he had $100,000 in the bank.  Roger remembered he and Kenny chuckled about Fred's claim, which ultimately proved to be more than true.  The conservatorship accounting indicated Fred had somewhere around $500,000 in the bank.[7]  Roger decided against sharing the information about Fred's finances with the Berg family for two reasons:  his position as a fiduciary for Fred and his concern that despite the few visits family were able to make over the past twenty years, some family members might begin visiting Fred in order to obtain access to the money or in an attempt to inherit.

[¶17.]    The revelations of Fred's financial condition in the spring of 1996 also prompted Roger to discuss with Fred the need for a will.  Roger did not tell Fred the

---

7.    The record does not indicate the source of this sum.  All the record indicates is that Fred was receiving benefits from the Veteran's Administration and that his brothers deposited some funds from Gilbert Berg's estate into the account as a burial fund.

exact size of his bank account, but left the matter at Fred's estimation of $100,000. Roger told Fred that in order to have a say in how his money would be distributed after death, Fred needed a will or the State of South Dakota would make that determination for him. Fred appeared to understand the purpose of a will based on his conversation with Roger and agreed to see an attorney.

[¶18.]     Roger scheduled an appointment with Attorney Foye for December 8, 1997, for purposes of drafting Fred's will. Fred recalled Attorney Foye from the power of attorney signing in 1995. Roger took Fred to that appointment and waited in the lobby while Attorney Foye met with Fred.

[¶19.]     Roger, a Vietnam veteran, admitted himself into a VA hospital in Kansas shortly after the December 8, 1997, appointment with Attorney Foye. He did not return to see Fred until the fall of 1998, several months after Fred signed the will. Roger continued visiting Fred until his death in 2006.

### Attorney Tom Foye

[¶20.]     Attorney Foye greeted Roger and Fred at the initial will drafting meeting on December 8, 1997. He then asked Roger to wait outside as it was Attorney Foye's practice to exclude caregivers, family members, and drivers from will meetings in order to ascertain whether there was undue influence being exerted. Attorney Foye met with Fred one-on-one for approximately twenty minutes. During that time, he asked Fred what his assets were. Fred replied he had bank accounts valued at $100,000. When asked who his family members were, Fred answered that he had two living sisters, and somewhere around twenty nieces and nephews including Roger. Fred indicated that he wanted his will to benefit

Roger and in the alternative Fred's two sisters, Anne Hunt of Washington and Helen Manns of North Dakota, if Roger predeceased Fred. Finally, Fred indicated that he wanted Roger to serve as his personal representative and U.S. Bank to serve if Roger was unable. After the meeting, Attorney Foye asked Roger to provide the full names and addresses of Fred's two sisters.

[¶21.]      During that meeting, Fred also indicated that he had difficulty seeing well enough to read and asked that Attorney Foye send him a draft copy typed in all capitals.[8] Attorney Foye mailed a copy of the draft will and a letter to Fred dated January 1, 1998. A follow-up telephone call was made by Attorney Foye in March 1998 to Tines at Good Samaritan asking Fred to return to the office and sign his will. On March 26, 1998, Alice Richter, Good Samaritan activities director, drove Fred to Attorney Foye's office. While Alice waited in the lobby, Fred signed his will, which was witnessed by Attorney Foye and his secretary Karen Fetzer (now Wenzlick). The three signatures were witnessed and notarized by Judy Schlangenhaufer (now Probst). Fetzer, Schlangenhaufer, and Attorney Foye all testified at trial that Fred understood who he was on the date he signed the will, knew that he was signing a copy of his last will and testament, and that there did not appear to be any improper influence exerted upon Fred in this matter.

*Good Samaritan Staff*

[¶22.]      During his eight years at Good Samaritan, Fred had regular contact with several staff members. Included among those were Tines, director of social

---

8.      Fred was eventually diagnosed with macular degeneration.

services at Good Samaritan, who had a double major in sociology and psychology and an associate's degree in social work. She had almost daily contact with Fred. Wendy Bruns worked in the office during the time Fred was a resident and also saw him on almost a daily basis as did Richter, the activities director.

### Diana Tines

[¶23.]    According to Tines, between the time Roger took Fred to see Attorney Foye on December 8, 1997, and the time Fred signed his last will and testament on March 26, 1998, Roger did not have physical contact with Fred. The Good Samaritan staff made several telephone calls to Roger in Kansas during this time for various medical issues such as falls and routine appointments. Roger also spoke with Fred via the telephone sometime around Christmas to wish him a happy holiday. On February 2, 1997, over a month before Fred signed his will, Roger was contacted by Tines to update Fred's file and advanced health care directives. Roger told Tines that Fred did not want extraordinary measures taken including cardio pulmonary resuscitation (CPR). Tines noted this in Fred's file.

[¶24.]    After Attorney Foye called Good Samaritan and spoke with Tines about Fred returning to sign his will, Tines became concerned that Fred might not have the legal capacity to sign his will. Her concerns were generated by a declaration of incompetency that Tines believed she had seen in Fred's VA records. However, when Tines consulted Fred's records at Good Samaritan she could find no such documentation. Tines asked Fred to sign a release of medical records form in order to obtain any relevant documentation from the VA. Despite a document request, no such forms or declaration were ever found. Tines also consulted with

Jeff Denison, the trust officer at U.S. Bank, about her concerns. Denison told Tines that Attorney Foye would have asked questions to ascertain Fred's capacity to sign the will and that Attorney Foye was very experienced and well respected in the legal community. Tines documented all her inquiries in Fred's file and she considered the matter resolved. A few days after the meeting with Attorney Foye, Fred gave Tines his copy of the signed will for placement in his records.

[¶25.]     Tines also testified that Fred declined physically in the last few years he lived at Good Samaritan progressing from the use of a cane to a walker. Tines eventually noted Fred used a wheel chair when she visited him at the VA Hospital at Fort Meade after he returned to that facility. She also noted that he had good days and bad days, but more good than bad. Tines noted that Fred would "light up" when Roger was expected for a visit and spoke about Roger's visits with great enthusiasm. Tines also testified that Fred would claim that the late actor Fred MacMurray[9] was his father, but also could and did discuss his natural parents with her. She considered Fred to be an eloquent speaker; typically oriented to person, place, and time; and very intelligent. She testified that if she had been Fred she would have left everything to Roger based on their relationship and the fact that very few family members other than Roger visited Fred while he was at Good Samaritan.

---

9.     Fred MacMurray, born August 30, 1908, died on November 5, 1991, after a career in theater, film, and television. His most memorable television role was as the father on "My Three Sons," from 1960 to 1972. http://www.imdb.com/name/nm0534045/bio (last visited June 8, 2010).

*Alice Richter*

[¶26.]     Richter was the activities director at Good Samaritan beginning in 1996 and had almost daily contact with Fred until he moved back to the VA Hospital at Fort Meade in 1999. She described him as oriented to person, place, and time, and able to participate in recreational activities. Richter noted Fred played cards, two-card bingo, watched television, and participated in social gatherings and day trips. She described him as able to participate in discussion groups on current topics as well as reminiscing groups, and he was able to discuss television programming he had recently viewed.

*Wendy Bruns*

[¶27.]     Bruns worked in the office at Good Samaritan while Fred was a resident and was eventually promoted to assistant administrator. As part of her employment during Fred's time in residence, Bruns administered Mini-Mental Status Exams (MMSE) to residents to assess mental functioning and reasoning as part of care planning. Fred's MMSE results for December 29, 1997, a few weeks after his initial appointment with Attorney Foye, indicated a score of twenty-seven out of thirty.[10] Fred's result on the MMSE administered by Bruns on March 27, 1998, the day after he signed his will was twenty-eight out of thirty. Bruns documented both times that Fred was "oriented times three," meaning oriented to time, place, and person. Bruns described Fred as being generally in good spirits

---

10.     According to Dr. Stephen Manlove, an expert witness for Opdahl, a score of twenty-five or better on the MMSE indicated good cognitive function.

and able to carry a conversation. Bruns also noted Fred would be excited whenever his nephew Roger was about to visit.

### The Will Contest

[¶28.]  After Fred passed away on November 5, 2006, Roger received a copy of Fred's will and learned that he was the sole heir, but that Fred's sisters, Anne, now deceased, and Helen, would have inherited in the event Roger predeceased Fred. Approximately two days later, Roger visited Helen and her daughter Virginia at Helen's home in North Dakota. Roger explained that he did not want any part of the inheritance and believed it should go to Helen. On March 10, 2007, Roger executed a disclaimer of any interest in Fred's will or estate, which he filed with the clerk of courts on March 30, 2007.

[¶29.]  On April 10, 2007, Opdahl, Fred's niece and daughter of Leonard Berg, filed a petition for adjudication of intestacy, determination of heirs, and appointment of a personal representative. Opdahl alleged undue influence by Roger. She sought an equal distribution of Fred's estate among all eight branches of the Berg family.

[¶30.]  Trial was held on the will contest on May 20, and July 8-9, 2009. Opdahl called Dr. Pablo Faustino, one of Fred's treating physicians at the VA Hospital at Fort Meade; Dr. Stephen Manlove, a psychiatrist and certified forensic psychiatrist; Jeff Denison, U.S. Bank trust officer; and Tines. She also offered her own testimony.

[¶31.]  Dr. Manlove testified that he was asked to conduct a forensic psychiatric evaluation on the issue of Fred's testamentary capacity by counsel for

the special representative. He was hired after Fred's death and never saw him personally. In rendering his opinion, Dr. Manlove read the deposition transcripts of Tines, Bruns, Richter, and Attorney Foye. He also interviewed Attorney Foye. In addition, he reviewed Fred's medical records. Dr. Manlove testified that it was his opinion that Fred was more susceptible to undue influence than the general public due to his schizophrenia. However, Dr. Manlove specifically stated that he was not testifying that Fred was influenced when he executed his will.

[¶32.] Dr. Manlove also opined that the record contained "evidence . . . [that] was much more overwhelming that [Fred] was probably thought disordered and psychotic on the day that the will was made." He further testified that it was significant that Fred's medical records indicated that in 1988 Fred claimed several relatives such as a non-existent sister Hattie, a non-existent niece Murtle Nash, a common-law-son Eugene Blackburn, and in 1992 a non-existent brother Charles. Dr. Manlove considered Fred's static delusion that Fred MacMurray[11] was his father a significant factor in rendering his opinion. He also testified that in his opinion, Attorney Foye's notes were too sparse on the issue of testamentary capacity

---

11. Dr. Manlove noted in his testimony an exchange documented between Gilbert Berg, Fred's father, and a medical provider at the VA Hospital at Fort Meade in 1946. When asked by the doctor what Gilbert Berg's relationship was with the patient, he replied: "I'm not the father. I'm only Gilbert Berg." When asked to explain his remark, Gilbert Berg stated: "Well, that woman over there says I'm the father." Dr. Manlove opined that these types of remarks may have been the origin of Fred's confusion as to the identity of his father. It could have provided, according to Dr. Manlove, the impetus for Fred to declare Fred MacMurray was his father and on another occasion that a German doctor, who Fred claimed had taken his hand after the lobotomy and helped him off the operating table, was his father.

and as such he considered Attorney Foye's statement that Fred possessed sufficient testamentary capacity on December 8, 1996, as not a credible statement. Finally, Dr. Manlove testified that he felt, after a review of the record, that he could not have defended the will signing under the South Dakota three-part test for testamentary capacity.

[¶33.] Dr. Faustino, who had worked in the psychiatry department at the VA Hospital at Fort Meade for twenty-seven years, but who was not board certified in psychiatry, testified Fred was not capable of independent living. He also opined that Fred's statements made at the age of seventy-seven that he wanted to go back to school, become a physician, and obtain life insurance, as well as the comments regarding Fred MacMurray, indicated unrealistic thought processes. These unrealistic thoughts, according to Dr. Faustino, were indicative of a benign psychosis. He also testified that one of the major side effects of the medication for schizophrenia, Stelazine, was Fred's loss of balance and propensity to fall. Dr. Faustino further testified that he thought it was surprising that Attorney Foye, Tines, or Denison, did not request that the VA document Fred's competency before the will signing given the VA was responsible for Fred's monies. However, he also noted that there was no general policy requiring such a request and if one had been made that Fred would have been referred to a non-VA doctor for the evaluation.

[¶34.] Opdahl, the will contestant, testified that she first visited Fred in 1945 at a mental hospital in North Dakota when she was eleven years old while on a family trip. She next saw Fred in 1954 when Opdahl was twenty and she accompanied her father and grandfather to the VA Hospital at Fort Meade. At that

time, Opdahl had just finished three months of psychiatric nursing course work, but had yet to receive a nursing degree. She testified she accompanied her father and uncle at the request of her father because Opdahl was the only family member at that time with any medical background. According to Opdahl, the VA doctors told them that after the lobotomy Fred could not think, could not reason, and could not reach valid conclusions. Opdahl last visited Fred in 1994 when she accompanied her brother Kenny on a visit. According to Opdahl's testimony, the Berg family made decisions regarding Fred as a group and that who ever was serving as the "family liaison" with the VA Hospital kept everyone informed. Opdahl expected that Roger would do the same after he was asked by Opdahl's sister, Norma, and Helen to take over in that capacity.

[¶35.] Opdahl became suspicious of Roger about five weeks after Fred's death when she learned the size of Fred's estate. Opdahl testified she filed the will contest because she had known since 1954 that Fred was of "unsound mind" and was "essentially a human robot" whose every activity had to be actively directed by someone else. Opdahl also testified that Helen's daughter, Virginia, and Roger's sisters were all in on a conspiracy to hide the size of Fred's estate from the rest of the family. She accused Roger of what she deemed to be two "felonies" including making a fraudulent will for his own benefit and creating the power of attorney.

[¶36.] After trial on the matter, the trial court entered findings of fact and conclusions of law. The trial court concluded that Fred's caretakers and companions over the last several years of his life knew Fred best and were more credible and persuasive than Opdahl's witnesses. It further concluded that Tines,

Bruns, and Richter were the most knowledgeable and best able to testify to Fred's competency to execute his will. It also found Roger to be credible because of his frequent contact with Fred and the consistency of his testimony with that of Tines, Bruns, and Richter. With regard to Attorney Foye, the trial court found him credible and that his conversation with Fred was properly focused on the three-prong South Dakota test for competency to execute a will.

[¶37.] With regard to Dr. Manlove, the trial court gave consideration to his forensic opinion testimony. Ultimately, however, greater credence was given to the testimony of Tines, Bruns, and Richter due to their day-to-day contact with Fred over a period of several years. The trial court also gave due consideration to Dr. Faustino's testimony, but gave it less weight for the same reason as Dr. Manlove's. Finally, with regard to Opdahl, the trial court found her testimony was entitled to little credence as it was mainly hearsay-upon-hearsay, conjecture, and speculation.

[¶38.] The trial court concluded that Fred had testamentary capacity at the time the will was drafted and executed. It also found Fred was aware he had a sizeable estate, but because he did not spend a significant amount of money Fred had no reason to know or care about the exact amount. Further, the trial court found Fred knew to whom he wanted his money to go: his nephew Roger and Fred's sisters Anne and Helen.

[¶39.] With regard to the undue influence claim, the trial court concluded that there was a proper relationship between a loving and caring nephew and uncle. Next, it concluded that Roger did not take advantage of his relationship with Fred as a nephew or as Fred's attorney-in-fact. It also concluded there was no evidence

that Roger unduly profited from Fred's will because Roger made a reasonable and credible decision to formally disclaim before the will contest was filed. The trial court also concluded there was no evidence that Roger contemplated or designed, or would benefit from, some conspiracy, subterfuge, fraud, or other machination to bypass the legal effect of the formal disclaimer as contended by Opdahl.

[¶40.] Finally, the trial court concluded that Helen was the sole surviving heir and was entitled to the rest, residue, and remainder of Fred's estate under his last will and testament. Opdahl's will contest claim was dismissed on the merits and with prejudice as to her and all other heirs and heirs-at-law whether claiming by intestacy or otherwise. Opdahl appeals raising the following issues:

1. Whether the trial court erred in its application of the standard of testamentary capacity under South Dakota law.

2. Whether the trial court erred when it concluded that Fred had testamentary capacity to execute his will.

3. Whether the trial court erred when it concluded that Roger did not exert undue influence over Fred in the execution of the will.

We have combined Opdahl's issues one and two as they are essentially the same.

## STANDARD OF REVIEW

[¶41.] A trial court's finding on the issue of a testator's testamentary capacity is reviewed by this Court under the clearly erroneous standard. *In re* Estate of Dokken, 2000 SD 9, ¶10, 604 NW2d 487, 490 (citing *In re* Estate of Long*, 1998 SD 15, ¶9, 575 NW2d 254, 255). The existence of undue influence is a question of fact for the trial court and is also reviewed by this Court under the clearly erroneous standard. *Id*. (citing *In re* Estate of Unke*, 1998 SD 94, ¶11, 583 NW2d 145, 147-48). Clear error is found when "after reviewing the entire evidence, we are left with the

definite and firm conviction that a mistake has been made." *Id.* (quoting *Unke*, 1998 SD 94, ¶11, 583 NW2d at 149). We resolve all conflicts in the evidence in favor of the trial court's determinations. *Id.* "The credibility of the witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the trial court and we give due regard to the trial court's opportunity to observe the witnesses and the evidence." *Id.* Documentary and deposition evidence are also reviewed under the clearly erroneous standard. SDCL 15-6-52(a).

## ANALYSIS AND DECISION

[¶42.] **1. Whether the trial court erred when it concluded that Fred had testamentary capacity to execute his will.**

[¶43.] Opdahl argues that because Fred had a static delusion that Fred MacMurray was his father, Fred did not know the natural objects of his bounty within the meaning of our case law on testamentary capacity. Helen, as the proponent, and Great Western Bank, as the special administrator, argue that Fred's delusions did not touch his testamentary capacity because he never sought to name Fred MacMurray, or any other fictitious relatives, in his last will and testament.

[¶44.] "An individual eighteen or more years of age who is of sound mind may make a will." SDCL 29A-2-501. We have defined sound mind, for purposes of testamentary capacity, as someone who "*without prompting, . . .* is able 'to comprehend the nature and extent of his property, the persons who are the natural objects of his bounty and the disposition that he desires to make of such property.'" *Dokken*, 2000 SD 9, ¶13, 604 NW2d at 491-92 (quoting *Long*, 1998 SD 15, ¶21, 575 NW2d at 257-58 (quoting *In re* Estate of Podgursky, 271 NW2d 52, 55 (SD 1978))). For purposes of testamentary capacity, we do not require the soundness of mind

enjoyed by those in perfect health, or that required to "make contracts and do business generally nor to engage in complex and intricate business matters." *Id*. (quoting *Long*, 1998 SD 15, ¶21, 575 NW2d at 257-58 (quoting Petterson v. Imbsen*, 46 SD 540, 546, 194 NW 842, 844 (1923))). "Testamentary capacity is not determined by any single moment in time, but must be considered as to the condition of the testator's mind a reasonable length of time before and after the will is executed." *Id*. ¶14, 604 NW2d at 491-92 (citing *Long*, 1998 SD 15, ¶23, 575 NW2d at 258).

[¶45.]    This Court has never been asked to define the natural objects of a testator's bounty. Some courts have limited that designation to those who will inherit unless a will exists. *See* Norris v. Bristow, 358 Mo 1177, 1187, 219 SW2d 367, 370 (1949) (noting nephews, nieces, brothers, sisters and other collateral heirs, are not natural or normal objects of a testator's bounty because of such relationships alone); *In re* Colman's Estate, 179 Neb 270, 273, 137 NW2d 822, 824 (1965). Other courts have noted that

> collateral heirs, such as brothers and sisters, are not 'natural objects of bounty' as that term is used in the interpretation of wills, and therefore, in cases such as this, where the next of kin are collaterals and one or more are unprovided for in the will, the pretermitted persons, in order to establish that the instrument is unnatural, must show affirmatively that they had peculiar or superior claims to the decedent's bounty; and, if no such claim is adduced, the instrument cannot be held to be unnatural.

Stormon v. Weiss, 65 NW2d 475, 505 (ND 1954) (quoting *In re* Easton's Estate, 140 CalApp 367, 35 P2d 614, 619 (1934)).

[¶46.]    We need not settle the matter of who are the natural object's of a testator's bounty today other than to say that an imaginary father, or other fictitious relative, who is not named in the will qualifies under neither definition. Fred did not attempt to devise his estate to Fred MacMurray; his claimed German father; or the non-existent niece, brother, or common-law-son. Fred devised his estate to Roger, a nephew with whom he had a loving and long-term relationship in the last sixteen years of his life and, at the time he executed the will, his two living sisters Helen and Anne.

[¶47.]    The trial court's finding also reconciles with our precedents in the area of testamentary capacity and insane delusions. *See In re* Estate of Schnell, 2004 SD 80, ¶17, 683 NW2d 415, 420. "The will of a testator found to suffer from an insane delusion will not be held invalid, however, unless it is shown that his delusion materially affected the terms and provisions of his will." *Id.* (citing *In re* Estate of Breeden, 992 P2d 1167, 1171 (Colo 2000)). *See also In re* Walther's Estate, 177 Or 382, 398-99, 163 P2d 285, 292 (1945).[12] The authorities cited by Opdahl also support this proposition. *See In re* Estate of Killen, 937 P2d 1368, 1372 (ArizCtApp1996) (holding to invalidate a will "the hallucinations or delusions must have influenced the creation and terms of the will such that the testator devised his property in a way that he would not have done except for the delusions.").

[¶48.]    Opdahl next argues that because the trial court did not enter a specific ruling on the credibility of the contemporaneous medical records offered by Drs.

---

12.    Furthermore, there is an adequate explanation for why Fred may have developed the delusion regarding who his father was. *See supra* n9.

Goff and Corsini, it erred. However, in the argument section of her brief, Opdahl does not indicate what portions or conclusions in those medical records she urges this Court to review other than to argue the records should be reviewed under the de novo standard when this Court is required to use the clearly erroneous standard under the provisions of SDCL 15-6-52(a). Other than one specific reference in the fact section to Dr. Corsini of the VA Hospital at Fort Meade who indicated that Fred's psychosis was "stable," or unimproved, it is not possible to ascertain what weight Opdahl seeks to have this Court place on facts reviewed by its expert witness Dr. Manlove. The same treatment is given by Opdahl to Dr. Goff's record notes on March 25, 1998, the day before Fred signed his will. Dr. Goff indicated that Fred's "history was unreliable," complained of back pain, and was unable to stay on one subject due to disordered thoughts. Dr. Manlove used these records in order to arrive at his opinion that Fred was thought disordered and psychotic on the day he signed the will.

[¶49.] The trial court found the testimony of the live witnesses with whom Fred interacted on a daily basis in and around the time he executed his will to be of greatest significance. The trial court had the contemporaneous medical records of Drs. Goff and Corsini before it, which were reviewed in detail while Dr. Manlove was on the stand. The trial court found Dr. Manlove to be credible, but less so than those witnesses who knew and interacted with Fred during his years at Good Samaritan. Furthermore, Opdahl does not provide any authority to support her proposition that it was error not to make a specific finding as to the credibility of the contemporaneous medical records reviewed by Drs. Goff and Corsini. As such,

that issue is waived. *See* State v. Fool Bull, 2009 SD 36, ¶46, 766 NW2d 159, 169 (citing State v. Pellegrino,1998 SD 39, ¶22, 577 NW2d 590, 599). Regardless, the contemporaneous medical records were considered by the trial court and we can find no error in the manner in which it reviewed and weighed that evidence.

[¶50.]     Opdahl next challenges the trial court's credibility determination regarding Attorney Foye and his clerical staff who witnessed Fred's signature on the will on March 26, 1998, Roger, and the Good Samaritan staff members who provided his care. We acknowledge there are some minor discrepancies in the testimony as indicated by Opdahl. We also note that there are some issues concerning the witnesses' abilities to recall details that occurred between sixteen and eleven years prior to the trial. We are not convinced, however, that the trial court was clearly erroneous when it found that Fred was competent to execute a will.

[¶51.]     We can find no indication that the trial court erred when it found Attorney Foye to be credible. Attorney Foye's testimony was based on over fifty years of experience in assessing and determining the competency of testators and on his contemporaneous notes and billing records. Attorney Foye testified to events that happened some eleven years before the trial. His memory and testimony were not perfect, but were thoroughly cross-examined and remained consistent throughout.

[¶52.]     With regard to Opdahl's challenge to Roger's testimony, we can give no credence to the suggestion that a fiduciary who keeps his principal's confidential information from other family members is not credible as a consequence. Whether

Opdahl believed Roger's role was to share information with the family is not controlling in determining Roger's credibility. Opdahl conceded that other family members who served as the liaison between Fred's caregivers and the family did not provide a steady stream of information, nor did she pursue those individuals when she did not receive any updates over a period of several years. We also decline to recognize that the extended members of the Berg family had a right to know anything about Fred's health issues, financial affairs, or his last will and testament. Again, Opdahl provides no authority for her proposition that she had a right to this information. *See id.*

[¶53.] Finally, Opdahl's argument that Tines' testimony is entitled to less credibility than the trial court gave it is without support in the record. It is true that Tines never testified that Fred got better, knew the nature and extent of his estate, or knew the natural objects of his bounty. However, she was never asked to do so. We can find no error by the trial court in its credibility determination regarding Tines, or any of the other witnesses whose testimony Opdahl was able to test at trial.

[¶54.] **2. Whether the trial court erred when it concluded that Roger did not exert undue influence over Fred in the execution of the will.**

[¶55.] Opdahl argues that in the event that this Court finds Roger's testimony less than credible the door is open to a claim of undue influence. In order to advance this claim, this Court must accept that Roger and Virginia entered into an agreement whereby Roger would receive a portion of the inheritance despite having signed and filed a disclaimer. We would have to do so despite the trial

court's finding that such an agreement was never made. Apart from Opdahl's claims, there is nothing for this Court to review under Issue 2 as there is no testimony or documentary evidence showing that Roger entered into such an agreement.

[¶56.]     Affirmed.

[¶57.]     ZINTER, MEIERHENRY and SEVERSON, Justices, and MILLER, Retired Justice, concur.

[¶58.]     MILLER, Retired Justice, sitting for KONENKAMP, Justice, disqualified.