#28955-aff in pt & rev in pt-SRJ
**2020 S.D. 2**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE ESTATE OF
RUSSELL O. TANK, Deceased.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
MARSHALL COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE SCOTT P. MYREN
Judge

* * * *

DANIEL K. BRENDTRO
ROBERT D. TRZYNKA of
Brendtro Law Firm, Prof. LLC
Sioux Falls, South Dakota

Attorneys for appellants Arlo
Tank, Renald Tank, Sherri
Castro, and Gina Ellingson.


REED RASMUSSEN of
Siegel, Barnett & Schutz, LLP
Aberdeen, South Dakota

Attorneys for appellee
Jason Bender.

* * * *

CONSIDERED ON BRIEFS
SEPTEMBER 30, 2019
OPINION FILED **01/22/20**

#28955

JENSEN, Justice

[¶1.] Russell Tank farmed in the Britton area most of his life and accumulated a sizeable estate. He died on May 25, 2016, at the age of 84. Russell's last will and testament, executed on December 19, 2012, was offered for probate on June 6, 2016. The will named Russell's neighbor and long-time farm tenant, Jason Bender, as his sole heir and specifically disinherited Russell's four adult children: Arlo Tank, Renald (Renny) Tank, Sherri Tank, and Regina (Gina) Ellingson (Children). Children filed a petition challenging the will on the grounds of lack of testamentary capacity, insane delusions, and undue influence. Following discovery, Bender filed a motion for summary judgment on Children's claims. The circuit court granted Bender's motion and entered an order dismissing the petition. Children appeal. We affirm in part and reverse in part.

**Facts and Procedural History**

[¶2.] After returning from serving in the U.S. Army in the 1950s, Russell married Harriet. Children were born during the marriage. Russell and Harriet separated in 1971 and divorced in 1974. Children were all under the age of ten at the time of the separation. Following the separation and divorce, Renny, Sherri, and Gina lived with Harriet, while Arlo lived with Russell. Children spent some time with Russell on the weekends. In his teen years, Renny began living with Russell and assisting on the farm.

[¶3.] Despite efforts to connect with their father while growing up, Children did not develop an emotional bond with him. Each of them explained that Russell never showed them love or affection and seemed disinterested in them and their

activities. Children described how Russell stared off in the distance when they were around, never made eye contact with them, and rarely talked with them. They asserted Russell's only interests were working and restoring vintage vehicles.

[¶4.]		Arlo farmed and lived with Russell until 1985, when Russell, for unknown reasons, abruptly told Arlo to leave. Arlo claimed he was forced to leave so quickly that he was unable to gather his possessions. He subsequently sued and was awarded a $40,000 judgment against Russell. Arlo continued to live in the area, but the two hardly spoke after 1986.

[¶5.]		Renny lived and farmed with his father until 2001, when Russell asked Renny to leave the farm. An acquaintance attempted to intervene, but Russell was unwilling to change his mind. Much like Arlo, Russell's reasons for asking Renny to leave are unknown. Renny moved a short distance from Russell, but the two saw each other only occasionally.

[¶6.]		Gina and Sherri moved from the Britton area after high school. Both visited the area over the years, but rarely saw their father. They each sent Russell letters, cards, and invitations to special occasions, but he never responded. Gina testified that she had little contact with Russell after 1979, and estimated that she had not spoken to her father since 1993. Sherri visited her father from time to time, but rarely saw Russell after 2005.

[¶7.]		Bender first met Russell while growing up in the Britton area through his father's acquaintance with Russell. In the late 1990s, Russell, Bender, Boyd Hagenson, and others began regularly playing cards together. In 2002, Russell leased his farmland to Bender for a cash rent of $50 per acre. Bender acknowledged

the rental rate was significantly less than market rent, but claimed it was the amount Russell requested. Bender also explained that he expended extra time and money to address weed problems in the first few years of farming the land. At the time, Russell had not grown a crop on the land for an entire year. The rental rate never changed in the fifteen years before Russell's death. Bender testified he mentioned to Russell more than once that the rent was too low, but claimed Russell would say it was fine and say that Bender could help him out around the farm.

[¶8.] Bender assisted Russell more and more over the years. Bender took Russell to see Russell's army friend several times in Ohio and drove Russell to visit the gravesite after Russell's friend passed away. In 2009, Russell had attorney Tom Sannes draft a power of attorney, naming Bender as attorney-in-fact. Later, Russell added Bender as a signatory on his bank account and gave Bender a large sum of cash to hold for Russell's safekeeping. Russell had also buried cash at different locations around the farm. He later told Bender where this money was located, and Bender created a map showing the locations. In 2015, Bender arranged for Russell to be placed in a nursing home after Russell was unable to care for himself. At this time, Bender dug up the cash Russell had buried and testified that he placed the money in a safe at his home.[1]

[¶9.] Russell prepared at least three wills during his lifetime. The first identified will was prepared by attorney Tom Sannes in 2001. Russell told Sannes he wanted to give nearly everything to his daughter Sherri and disinherit his other three children. Sannes asked a local physician to perform a competency exam

---

1. At the time of Russell's death, Bender was holding $149,000 of Russell's cash.

before drafting the will. The physician examined Russell and sent a letter to Sannes concluding that Russell was mentally competent. The 2001 will executed by Russell gave all of Russell's property to his daughter Sherri, except for a few vintage vehicles given to Russell's friends. Sherri was also named as Russell's personal representative. The other three children were specifically disinherited.

[¶10.]     Russell executed a second will in 2004. At this time, Russell told Sannes that he wanted to remove Sherri as a beneficiary and name Bender instead. Sannes had no impression that Bender encouraged or was involved in Russell's decision to change his will. Except for a few vehicles given to other friends, the 2004 will named Bender as Russell's beneficiary and personal representative. Sherri and the other three children were specifically disinherited in the 2004 will.

[¶11.]     Sannes retained memos of each of his meetings with Russell showing that Russell expressed an understanding of his heirs, his property, and testamentary intentions. Sannes found Russell to be "decisive and able to clearly express his wishes" in each meeting. Sannes believed Russell was competent and "fully understood" what he was doing when he executed the 2001 and 2004 wills and the power of attorney.

[¶12.]     Russell made a third will in 2012, prepared by attorney Kari Bartling. Russell was 80 at the time. The will revoked all prior wills and named Bender as Russell's sole heir and personal representative. Children were again specifically disinherited in the 2012 will.

[¶13.]     Bartling prepared a contemporaneous memorandum reflecting her discussions with Russell prior to drafting the 2012 will. Bartling's notes reflect that

Russell described his assets and answered questions about his background, Children, and other family members. Russell told Bartling that he did not want to leave anything to Children because he had already helped them out and no longer had contact with any of them. Russell stated that he did not know where his two daughters lived and had hardly seen them since the divorce. He also said his two sons live close to him but described a lack of any contact with them. Russell also described some of the things Bender had done for him and told Bartling that he was very fond of Bender and could not think of a better person to receive his assets. Bartling concluded that "Russell was very well aware of what he owned," had a "good head on his shoulders as far as business," and "appeared to be very intelligent." Bartling asked Russell if Bender had talked to him about changing his will. Russell said "no" and stated that Bender did not know he was doing this.

[¶14.] After Russell's death, Bender commenced an informal probate of Russell's 2012 will. Arlo and Renny filed a petition challenging the will. Sherri and Gina joined in an amended petition shortly thereafter. The amended petition alleged Russell lacked testamentary capacity and that the 2012 will was a product of an insane delusion and undue influence.

[¶15.] Children retained Dr. Rodney Swenson, a psychologist, as an expert witness concerning Russell's competency and mental health. Dr. Swenson did not personally examine Russell, and his opinions were based on medical records, depositions, and statements from Children and others. Dr. Swenson concluded that Russell developed a chronic delusional disorder early in his life that affected his ability to form and maintain close relationships with Children and others. Dr.

Swenson also concluded that Russell started developing vascular dementia in his later years. Dr. Swenson cited Russell's distrust of societal institutions, limited topics of conversation, obsession with keeping loaded guns hidden around him, burying large sums of money, and ignoring Children as examples of the delusional disorder affecting Russell's daily life activities. As to the 2012 will, Dr. Swenson opined that: (1) Russell lacked testamentary capacity to execute the will because he was unable to form, perceive, and understand his connection to Children; (2) the will was the product of an insane delusion concerning Russell's beliefs as to the nature of his relationship with Children; and (3) Russell was susceptible to undue influence.

[¶16.] Bender also retained a psychologist, Dr. Daniel Tranel, to address Russell's competency and mental state at the time he executed the 2012 will. Like Dr. Swenson, Dr. Tranel did not personally examine Russell and generally relied on the same information as Dr. Swenson. Dr. Tranel concluded that Russell did not demonstrate symptoms of a delusional disorder. Instead, Dr. Tranel opined that Russell's struggles with relationships and distrust of people and institutions would be more accurately placed on the autism spectrum or possibly a personality disorder. Dr. Tranel also acknowledged that Russell had begun developing dementia the last few years of his life.

[¶17.] On October 19, 2018, Bender filed a motion for summary judgment, or in the alternative, a motion to exclude the opinions of Dr. Swenson. Children resisted the motions and both parties presented extensive affidavit and deposition testimony. The circuit court heard arguments and orally granted Bender's motion

for summary judgment on Children's petition. The court did not address Bender's motion to exclude the testimony of Dr. Swenson. The court concluded as a matter of law that Russell did not lack testamentary capacity when he executed the 2012 will. The court also determined that Russell did not suffer from an insane delusion concerning his relationship with Children, concluding Russell's belief that he had an estranged relationship with Children was based on reality. Finally, the court granted summary judgment on the undue influence claim, determining there was no evidence showing Bender had an improper disposition to unduly influence Russell.

[¶18.]     Children appeal the circuit court's order granting summary judgment, raising three issues:

1. Whether the circuit court erred in concluding there were no genuine issues of material fact showing Russell lacked testamentary capacity to execute the 2012 will.

2. Whether the circuit court erred in determining there were no genuine issues of material fact showing Russell suffered from an insane delusion affecting the terms of his 2012 will.

3. Whether the circuit court erred in determining there were no genuine issues of material fact showing Russell's 2012 will was tainted by undue influence.

**Standard of Review**

[¶19.]     "We review a circuit court's entry of summary judgment under the de novo standard of review." *Harvieux v. Progressive N. Ins. Co.*, 2018 S.D. 52, ¶ 9, 915 N.W.2d 697, 700 (quoting *Wyman v. Bruckner*, 2018 S.D. 17, ¶ 9, 908 N.W.2d 170, 174). "When conducting a de novo review, '[w]e give no deference to the circuit court's decision[.]'" *Zochert v. Protective Life Ins. Co.*, 2018 S.D. 84, ¶ 18, 921

N.W.2d 479, 486 (quoting *Oxton v. Rudland*, 2017 S.D. 35, ¶ 12, 897 N.W.2d 356).

"On appeal from a grant of summary judgment, we must determine whether the

moving party demonstrated the absence of any genuine issue of material fact and

showed entitlement to judgment on the merits as a matter of law." *Niesche v.*

*Wilkinson*, 2013 S.D. 90, ¶ 9, 841 N.W.2d 250, 253. "We view the evidence in favor

of the nonmoving party and reasonable doubts are resolved against the moving

party, but the nonmoving party must have presented specific facts showing that a

genuine, material issue for trial existed." *Id.*

### Analysis and Decision

> 1. *Whether the circuit court erred in concluding there were no genuine*
>    *issues of material fact showing Russell lacked testamentary capacity*
>    *to execute the 2012 will.*

[¶20.]     A testator has the privilege and right to dispose of his or her property

within the limits of and in the manner fixed by our statutes. *Briggs v. Briggs*, 2019

S.D. 37, ¶ 23, 931 N.W.2d 510, 516. The minimum requirements for making a will

under SDCL 29A-2-501 are that an individual must be at least eighteen years of age

and of sound mind.

[¶21.]     One has sound mind or testamentary capacity "if, without prompting,

he is able to comprehend the nature and extent of his property, the persons who are

the natural objects of his bounty and the disposition that he desires to make of such

property." *In re Estate of Long*, 2014 S.D. 26, ¶ 18, 846 N.W.2d 782, 786.

"Testamentary capacity is not determined by any single moment in time[.]" *In re*

*Estate of Pringle*, 2008 S.D. 38, ¶ 20, 751 N.W.2d 277, 284. The state of the

testator's mind must be considered for a reasonable length of time before and after

the will is executed. *Id.* The party challenging the will has the burden of establishing lack of testamentary capacity. *In re Estate of Dokken*, 2000 S.D. 9, ¶ 25, 604 N.W.2d 487, 494; *see also* SDCL 29A-3-407.

[¶22.] Children do not dispute that Russell comprehended the nature and extent of his property when he executed the 2012 will, but claim that Russell was unable to comprehend the natural objects of his bounty or the disposition he intended to make of the property. Children argue that the comprehension of one's relatives requires more than a knowledge of their names and familial identities. They maintain that to comprehend means "to take in the meaning, nature, or importance of" these relationships, particularly with Children. Children cite language from *In re Anders Estate*, 88 S.D. 631, 636, 226 N.W.2d 170, 173 (1975), arguing that a testator must "recollect and apprehend the nature of the claims of those who are excluded from participating in his bounty." Children contend that Russell's delusional disorder caused him to be emotionally detached from them and unable to comprehend the importance of a father/child relationship and the disposition he otherwise would have wanted to make to Children.

[¶23.] Children's arguments are contrary to our decisions on testamentary capacity. This Court has consistently held that testamentary capacity exists under the second and third elements of our test if the testator knows his or her heirs and the disposition he or she desires to make of the property. *Stockwell v. Stockwell*, 2010 S.D. 79, ¶ 26, 790 N.W.2d 52, 62 (written instrument signed by decedent provided evidence that he understood the intended disposition of his property); *Pringle*, 2008 S.D. 38, ¶ 28, 751 N.W.2d at 286 (finding of testamentary capacity

sustained when evidence showed testator "was cognizant of her children" at the time); *In re Estate of Schnell*, 2004 S.D. 80, ¶ 18, 683 N.W.2d 415, 421 (evidence that testator "knew the natural objects of his bounty" supported a finding of capacity); *Dokken*, 2000 S.D. 9, ¶ 23, 604 N.W.2d at 494 (evidence that testator "knew who his relatives were" supporting the finding of testamentary capacity); *In re Estate of Linnell*, 388 N.W.2d 881, 884 (S.D. 1986) (evidence was sufficient to support a finding of capacity where the attorney testified that the testator knew "who his heirs were at that time" of making the will).

[¶24.]     Attorney Bartling testified that Russell knew his Children at the time he executed the 2012 will and described the absence of a relationship with them. Bartling testified that Russell expressed a clear intention to disinherit Children and give his property to Bender.  Children presented no facts disputing Bartling's testimony.

[¶25.]     Children contend that Dr. Swenson's opinions concerning the impact Russell's delusion disorder had on his relationship with them created a question of fact concerning Russell's testamentary capacity.  However, Dr. Swenson's conclusions misapply the standard for testamentary capacity, and conflate the separate doctrines of testamentary capacity and insane delusions.  As Professor Thomas E. Simmons explains in his excellent discussion of testamentary incapacity, insane delusions, and undue influence:

> Testamentary capacity precedes an analysis of either undue influence or insane delusions; it considers whether the individual had the capacity to understand the nature and extent of his property, to know the natural objects of his bounty, and to form an intent regarding the disposition of his property at death. . . .

> Only after it has been determined that an individual has testamentary capacity will the doctrines of insane delusions and undue influence have any possibility of operating. An individual lacking capacity can never be subject to insane delusion or undue influence because those doctrines describe invalidating circumstances on all, or portions, of an otherwise valid will[.]

Thomas E. Simmons, *Testamentary Incapacity, Undue Influence, and Insane Delusions*, 60 S.D. L. Rev. 175, 179–181 (2015).

[¶26.]      Evidence that Russell suffered from a delusional disorder and some degree of dementia is insufficient to create a fact question on testamentary capacity at the time he made the 2012 will. The evidence is undisputed that Russell had the ability to understand and recollect the nature and extent of his property, the natural objects of his bounty, and his intended disposition of his property. The inquiry for testamentary capacity at that point ends. Children have failed to present any facts supporting a claim that Russell lacked testamentary capacity at the time he made the 2012 will.

> 2. *Whether the circuit court erred in determining there were no genuine issues of material fact showing Russell suffered from an insane delusion affecting the terms of his 2012 will.*

[¶27.]      A will or portion of a will may be invalidated by an insane delusion of the testator. *In re Estate of Berg*, 2010 S.D. 48, ¶ 47, 783 N.W.2d 831, 842–43; *Schnell*, 2004 S.D. 80, ¶¶ 14–18, 683 N.W.2d 415, 419–21; *Irwin v. Lattin*, 29 S.D. 1, 135 N.W. 759, 762 (1912). In *Schnell*, this Court described the doctrine of insane delusions as follows:

> An insane delusion is insanity upon a single subject. An insane delusion renders the person afflicted incapable of reasoning upon that particular subject. He assumes to believe that to be true which has no reasonable foundation in fact on which to base his belief. A person persistently believing supposed facts which have no real existence against all evidence and probability, and

conducting himself upon the assumption of their existence, is so
far as such facts are concerned, under an insane delusion.

*Schnell*, 2004 S.D. 80, ¶ 15, 683 N.W.2d 415, 420 (quoting *In re Estate of Flaherty*,

446 N.W.2d 760, 763 (N.D. 1989)). "The will of a testator found to suffer from an

insane delusion will not be held invalid, however, unless it is shown that his

delusion materially affected the terms and provisions of his will." *Berg*, 2010 S.D.

48, ¶ 47, 783 N.W.2d at 842.

[¶28.]     Children argue that questions of fact exist as to whether Russell was

suffering from an insane delusion when he made the 2012 will. They cite to Dr.

Swenson's opinions that Russell was paranoid and suffered from a delusional

disorder his entire life. Children claim that Dr. Swenson presented evidence from

which a jury could conclude his delusional disorder "made him incapable of

understanding or recalling the contact that his children had with him; incapable of

understanding or recalling their efforts to care for him; incapable of understanding

his own role in causing and perpetuating the failed relationships." They contend

that "an insane delusion may exist even though there was some evidence from

which the person afflicted might have formed his belief of judgment." *See Schnell*,

2004 S.D. 80, ¶ 15, 683 N.W.2d at 420.

[¶29.]     For summary judgment purposes, we accept Dr. Swenson's opinions

that Russell's delusional disorder made him paranoid and unable to form normal

relationships with people, including Children. However, this evidence is

insufficient to create a question of fact as to whether Russell suffered from an

insane delusion. There was no evidence he was delusional about a particular

subject or topic that "*materially affected the terms and provisions of his will.*" *See*

*Berg,* 2010 S.D. 48, ¶ 47, 783 N.W.2d at 842 (emphasis added). "An insane delusion is insanity upon a single subject." *Schnell,* 2004 S.D. 80, ¶ 15, 683 N.W.2d at 420. Often referenced as "monomania"[2], an insane delusion "is not a general defect of the mind but rather is an insanity directed to something specific, that is, a particular person or thing. . . ." 79 Am. Jur. 2d Wills § 76.

[¶30.]     Our prior decisions discussing the doctrine of insane delusions recognize that an insane delusion involves a false belief concerning a particular subject. *Berg,* 2010 S.D. 48, ¶ 25, 783 N.W.2d at 838 (testator held onto a delusion that he had relatives that did not exist and that the actor Fred MacMurray was his father); *Schnell,* 2004 S.D. 80, ¶ 18, 683 N.W.2d at 420 (considered evidence of a belief by the testator that his sons were hiding in the hills with guns to hurt him); *Irwin,* 29 S.D. 1, 135 N.W. at 763 (considered evidence of testator's belief that she was able to communicate with "departed spirits who guided all her actions in the ordinary affairs of life").

[¶31.]     Here, Dr. Swenson's opinions that Russell had a lifelong delusional disorder that affected his ability to form relationships with his children did not create a basis to invalidate Russell's will for an insane delusion.[3] Dr. Swenson

---

2.    Monomania is defined as: "Insanity about some particular subject or class of subjects, usu[ally] manifested by a single insane delusion." *Black's Law Dictionary* 1160 (10th ed. 2014). *See also Irwin,* 29 S.D. 1, 135 N.W. at 763 (using insane delusion and monomania interchangeably).

3.    As noted by Professor Simmons, "Despite its name, which resonates with psychiatric trappings, an insane delusion is a legal concept rather than a scientific one." Simmons, *supra* ¶ 27, at 194. *See also* Bradley E.S. Fogel, *The Completely Insane Law of Partial Insanity: The Impact of Monomania on*

(continued . . .)

described relationship issues and odd behaviors exhibited by Russell that Dr. Swenson attributed to Russell's delusional disorder, but Dr. Swenson failed to identify a fixed, delusional belief that materially affected the terms of Russell's will. Dr. Swenson also pointed to inaccurate statements Russell made to his attorneys about his relationship with his children.[4] Russell's recollections and perceptions of his interactions with Children may differ from Children's, and may have even been inaccurate, but they fail to create a question of fact showing that Russell was suffering from an insane delusion. Rather, Russell's statements reflect the unfortunate reality, which is undisputed in this record, that Russell had a poor relationship with Children. As the circuit court aptly concluded, "I accept Dr. Swenson's conclusion that part of Russell's psychological character interfered with his ability to form normal relationships with his Children. I do not accept his application of those psychological facts to South Dakota's law of insane delusions."

[¶32.]        Children have failed to present facts to show that Russell was suffering from an insane delusion that caused him to disinherit Children.

> 3. *Whether the circuit court erred in determining there were no genuine issues of material fact showing Russell's 2012 will was tainted by undue influence.*

---

(. . . continued)
   *Testamentary Capacity*, 42 Real Prop. Prob. & Tr. J. 67, 68 (2007) (noting that courts have fashioned the legal doctrine of insane delusions).

4.    Dr. Swenson relied upon statements made by Russell to his attorneys in which he claimed he had no contact with his daughters since the divorce, that he did not know where they lived, that he was upset he had not seen his daughters at a local parade, that he lost contact with his sons years ago, that Renny did not contact him or wave to Russell when driving on the road, and that Russell believed his sons had been "terrible" to him.

[¶33.]     A will contestant has the burden to prove undue influence by the greater weight of the evidence. *Pringle*, 2008 S.D. 38, ¶ 44, 751 N.W.2d at 291. "For influence to be undue it must be of such a character as to destroy the free agency of the testator and substitute the will of another for that of the testator." *Id.* (quoting *Schnell*, 2004 S.D. 80, ¶ 21, 683 N.W.2d at 421).[5] We have stated that claims of undue influence are generally questions of fact. *Pringle*, 2008 S.D. 38, ¶ 18, 751 N.W.2d at 284. A party seeking to prove undue influence must establish: "(1) the decedent's susceptibility to undue influence; (2) an opportunity to exert such influence and effect the wrongful purpose; (3) a disposition to do so for an improper purpose; and, (4) a result clearly showing the effects of undue influence." *Stockwell*, 2010 S.D. 79, ¶ 35, 790 N.W.2d at 64. Therefore, to successfully resist summary judgment, Children must "show that they will be able to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof." *Foster-Naser v. Aurora Cty.*, 2016 S.D. 6, ¶ 11, 874 N.W.2d 505, 508.

[¶34.]     Bender does not dispute that there are facts showing he had the opportunity to influence Russell. He does, however, dispute that Children presented genuine issues of fact on the other elements of undue influence upon which Children have the burden of proof.

---

5.     A presumption of undue influence arises when there is (1) a confidential relationship between the testator and a beneficiary, and (2) the beneficiary "participates in preparation and execution of the will and unduly profits therefrom." *In re Estate of Duebendorfer*, 2006 S.D. 79, ¶ 32, 721 N.W.2d 438, 446–47. Children concede that a presumption of undue influence did not arise in this case because Bender did not participate in the preparation of Russell's 2012 will.

[¶35.] As to Russell's susceptibility to undue influence, Children argue that the opinions of Dr. Swenson and testimony of other witnesses create disputed facts for trial. In particular, Children presented testimony of a bank employee who interacted and conducted bank business with Russell for more than twenty years. The bank employee stated that she became increasingly concerned about Russell's mental acuity in his later years and that he seemed less certain about what he wanted to do when he came into the bank. The bank employee also expressed concern about the amount of cash Russell began withdrawing, as well as Boyd Hagenson's involvement in Russell's banking business.[6] She observed that Hagenson often brought Russell to the bank and seemed overly engaged in Russell's private banking business.

[¶36.] The bank employee described one particular transaction in the fall of 2013 when Russell, accompanied by Hagenson, sought to negotiate a $28,000 check for cash. She instead convinced Russell to take $8,000 cash and a cashier's check for the balance. She overheard Hagenson telling Russell to include Hagenson's name on the cashier's check. The bank employee reluctantly added Hagenson's name to the check after Russell told her to do so. Later, Russell came to the bank, this time accompanied by Bender, stating that the check and cash could not be

---

6. There is evidence that Hagenson spent time with both Russell and Bender. However, there are no facts showing Hagenson was involved in the preparation of the 2012 will or that Bender benefitted from any of Hagenson's actions.

located and Hagenson's whereabouts were unknown.[7] During this visit, Bender asked Russell if he wanted to add Bender's name to Russell's account. Russell then conferred with the bank about adding Bender's name to Russell's account, and later did so.

[¶37.] Dr. Swenson opined that Russell was showing signs of vascular dementia by at least 2009, and that his dementia likely would have caused problems for Russell some time before it became apparent in 2009. Dr. Swenson suggested that Russell's delusional disorder and dementia would have made him more susceptible to manipulation and influence by others.

[¶38.] Bender disputes Dr. Swenson's opinions, and claims they are unsupported by evidence. Bender cites Children's own description of Russell as "domineering", "hardheaded", and "controlling".[8] Bender submits that Russell was strong willed and distrustful of people, which "weighs against a finding that such a person is susceptible to undue influence." Although Bender believes Dr. Swenson's opinions are unfounded, they were not stricken by the circuit court and therefore remain a part of the summary judgment record. Moreover, Bender's invitation to "weigh" Dr. Swenson's opinions against other evidence is not appropriate on summary judgment. We conclude that disputed facts exist as to Russell's susceptibility to undue influence.

---

7. The cashier's check had not been negotiated. It is unclear what happened to the check or the cash.

8. Importantly, these descriptions of Russell were from a time when Children interacted with Russell when he was younger. Renny testified that Russell mellowed as he grew older. The record also suggests that as Russell aged, he became more reliant on Bender for assistance.

[¶39.]     On the question of Bender's disposition to influence Russell for an improper purpose, the circuit court concluded there were no facts supporting a finding that Bender had such a disposition. Children claim the circuit court failed to consider circumstantial evidence showing Bender's improper disposition to influence and take advantage of Russell. They cite *In re Metz Estate* to support their claim that direct proof of undue influence is rarely available and is not required to present a question of fact for undue influence:

> There is no direct proof of undue influence in this case. There seldom is. Undue influence is not usually exercised in the open. "It is therefore usually solely through inferences drawn from surrounding facts and circumstances that a court arrives at the conclusion that a will is the product of undue influence working on the mind of the testator."

78 S.D. 212, 221, 100 N.W.2d 393, 397 (1960) (quoting *Johnson v. Shaver*, 41 S.D. 585, 172 N.W. 676, 678 (1919)).

[¶40.]     Children initially argue that the farm rental arrangement between Russell and Bender provides circumstantial evidence of Bender's ability and disposition to exert undue influence over Russell. They cite *Neugebauer v. Neugebauer*, 2011 S.D. 64, 804 N.W.2d 450, where we affirmed a finding that a mother's agreement to sell land to her son at a price substantially below fair market value was the result of undue influence. Affirming the circuit court's finding that the son had a disposition to exert undue influence, the Court considered, among other evidence, that the son "historically took advantage of [mother] by paying her less than fair market rent under the oral lease." *Id.* ¶ 24, 804 N.W.2d at 456.

[¶41.]     Here, Bender testified that Russell set the amount of rent and that the rent was never increased because Russell always rebuffed Bender's suggestions to

do so. However, Bender acknowledged the rent was below market rate. Bender further acknowledged that rental rates for agricultural property in the area increased significantly after 2002. Despite these increases, the rental rate for Russell's farmland never changed, even after Bender became Russell's fiduciary in 2009.[9]

[¶42.]    Evidence also shows that Russell gave Bender a large amount of cash to hold for him for "safekeeping" in 2009. After Russell was placed in the nursing home in 2015, Bender testified that he dug up the additional cash that Russell had buried around the farm and put it in his safe. Bender did not inventory or account for any of this cash until after Russell's death. Aside from a friend who assisted him with digging up some of the buried money, Bender did not disclose his receipt of this cash to anyone until after Russell's death. Children also presented testimony from a neighbor concerning a transaction with Bender in which Bender paid the neighbor cash to purchase a tractor. This transaction occurred after Bender had access to Russell's cash, and the witness claimed the money received from Bender smelled so moldy that she put it outside to air out. Bender admitted that some of the money he received from Russell smelled "slightly" moldy.

[¶43.]    These circumstances, viewed most favorably to Children, raise material issues of fact concerning whether Bender took advantage of Russell in the

---

9.    There is no evidence that Bender made use of the power of attorney to rent Russell's land. However, when Bender became aware he was Russell's attorney-in-fact, "a fiduciary relationship [was] created" and "the fiduciary [had] a duty to act primarily for the benefit of the other." *See Duebendorfer*, 2006 S.D. 79, ¶ 26, 721 N.W.2d at 445.

rental arrangement and in handling the cash Russell gave him and whether such evidence supports a finding that Bender had a disposition to influence Russell for an improper purpose. On summary judgment, "[a]ll reasonable inferences drawn from the facts must be viewed in favor of the non-moving party." *St. Onge Livestock Co., Ltd. v. Curtis*, 2002 S.D. 102, ¶ 10, 650 N.W.2d 537, 540–41.

[¶44.]     Finally, we consider whether Children have presented a question of fact whether the disposition of Russell's 2012 will clearly shows the effects of undue influence. Bender argues that the evidence fails to show such a result because the 2012 will was consistent with the prior will Russell had made in 2004. He cites *In re Blake's Estate* which states, "The consistency and harmony of the two wills and the considerable lapse of time between their execution strongly negatives the presence of undue influence[.]" 81 S.D. 391, 400, 136 N.W.2d 242, 247 (1965). While the consistency between the 2004 and 2012 wills may be relevant, a fact finder could also consider the circumstances involving Russell's decision to give nearly all his property to Sherri in the 2001 will and then disinherit her completely in the 2004 will, just three years later.

[¶45.]     After Sherri had already been named the primary beneficiary in the 2001 will, Bender began renting farmland from Russell at a reduced rate and became more involved in Russell's affairs. Aside from Bender's increased involvement with Russell, there is nothing in the record to suggest that anything occurred in the relationship between Russell and Sherri from 2001 to 2004 that would have caused Russell to disinherit his daughter. A fact finder could consider these circumstances, and inferences drawn from them, in determining whether

Russell's decision to disinherit Sherri in the 2012 will was clearly the result of any undue influence by Bender.

[¶46.] In contrast, the "causation" element concerning Russell's decision to disinherit Arlo, Renny, and Gina in the 2012 will is more problematic because Russell had already decided to disinherit them in the 2001 will. Children have made no claim that Bender engaged in any undue influence before Russell made the decision to disinherit Arlo, Renny, and Gina in the 2001 will.

[¶47.] Children argue that notwithstanding the prior wills, Russell made an unnatural disposition of his estate, which may support a finding that the will was clearly a result of undue influence. They claim that both the 2004 and 2012 wills resulted in an unnatural disposition to Bender because Children were "the natural objects of a [Russell's] bounty." *See Blake's Estate*, 81 S.D. at 400, 136 N.W.2d at 247. While Arlo, Renny, and Gina may have been Russell's heirs at law, there is no evidence to show that Russell had any testamentary disposition toward them, even in the absence of any alleged undue influence by Bender. The evidence shows that Russell's relationship with Arlo and Renny became more estranged after Russell kicked them off the farm. Further, Gina's relationship with her father, by her own testimony, was nearly non-existent after 1979. It is undisputed that Russell had already decided to disinherit Arlo, Renny, and Gina in 2001, before there was any claim of undue influence by Bender. Arlo, Renny, and Gina have failed to present any evidence showing "causation" between any alleged undue influence by Bender and Russell's decision to disinherit each one of them in the 2004 will and, more particularly, in the 2012 will. Therefore, the circuit court properly granted

summary judgment as to any claim that undue influence caused Russell to disinherit Arlo, Renny, and Gina.

[¶48.] By their very nature, claims of undue influence are fact intensive inquiries. The "evidence and favorable inferences from that evidence" must be viewed "in a light most favorable to the nonmoving party" at the summary judgment stage. *Stone v. Von Eye Farms*, 2007 S.D. 115, ¶ 6, 741 N.W.2d 767, 769. Doing so here, we conclude that material issues of fact exist on Sherri's claim that 2012 will was the product of undue influence, and summary judgment should not have been entered on her claim. Conversely, there is no evidence to support a claim that Russell's disinheritance of Arlo, Renny, and Gina in his 2012 will was clearly the result of undue influence.

[¶49.] We reverse the entry of summary judgment on Sherri's claim of undue influence. We affirm the entry of summary judgment on all the other claims in Children's petition challenging the 2012 will.

[¶50.] GILBERTSON, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.