#29809-r-JMK
**2023 S.D. 59**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE
ESTATE OF RUSSELL O. TANK,
Deceased.
* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
MARSHALL COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE TONY L. PORTRA
Judge

* * * *

DANIEL K. BRENDTRO
ROBERT D. TRZYNKA of
Hovland, Rasmus, Brendtro
   & Trzynka, Prof. LLC
Sioux Falls, South Dakota              Attorneys for Appellant Sherri
Castro.


REED RASMUSSEN of
Siegel, Barnett and Schutz, LLP
Aberdeen, South Dakota            Attorneys for Appellee Jason
Bender.

* * * *

ARGUED
OCTOBER 5, 2022
OPINION FILED **11/21/23**

#29809

KERN, Justice

[¶1.]        For most of his life, Russell Tank farmed a sizeable estate in Britton, South Dakota.  Upon his death, Jason Bender, Russell's neighbor and long-time farm tenant, offered Russell's last will and testament for probate.  The will named Bender as the Estate's sole heir and personal representative.  Russell's four children challenged the validity of the will based on a lack of testamentary capacity, insane delusions, and undue influence.  The circuit court granted summary judgment against the children on all three grounds.  On appeal to this Court, we reversed the circuit court's determination that no material issues of fact existed on the undue influence claim brought by Sherri Castro, Russell's daughter.  On remand, Sherri contested the will on the grounds of undue influence.  The matter was tried to a jury which returned a verdict for Sherri, finding that Bender unduly influenced Russell's will.  Post-trial, Bender filed a renewed motion for judgment as a matter of law and, in the alternative, a motion for a new trial.  The circuit court granted both, finding that there was insufficient evidence to support the jury's verdict of undue influence. Sherri appeals.  We reverse.

## Factual and Procedural History

[¶2.]        Russell Tank met and married his wife Harriet shortly after returning from service in the U.S. Army during the 1950s.  Four children were born to the marriage: Sherri Castro, Arlo Tank, Renald (Renny) Tank, and Regina (Gina) Ellingson.  Russell and Harriet divorced in 1974, entering into a stipulation resolving custody of their children.  They agreed that Arlo would live with Russell on the farm, while the other three children would live with Harriet.  Russell's farm

consisted of four and a half quarters in Waverly Township, about three miles south and a mile east of Britton. Initially, Harriet and the three children moved in with her parents while she recovered her financial footing. Harriet began working in a nursing home and eventually became Horton Industry's first female employee. Harriet and the three kids settled in Britton.

[¶3.]    Growing up, Sherri, Renny, and Gina would visit Russell every other weekend during the school year and would spend entire weeks at the farm during summer vacation, especially around baling season. Despite their efforts to form a connection and their attempts to spend time with Russell, the now-adult children testified at trial that Russell never seemed interested in them or their activities, and he failed to show them love or affection. The children described how Russell would not make eye contact with them, rarely talked to them, and would stare off into the distance when they were around. They claimed that Russell's only interests involved his dog Whitey and restoring vintage vehicles.

[¶4.]    At the time of his parent's divorce, Arlo was seven and remained with his father and helped him farm. Arlo described growing up in Russell's home as "eerie, quiet, . . . and scary" with "no furniture [and] no food." As Arlo aged, he took on more farm-related responsibilities. Arlo testified that Russell did not like banks, did not trust people and hated the IRS and cops. If he told his father "no" when asked to do something, Russell would fly into a rage. Due to his father's distrust for banks, Russell and Arlo placed the farm operating loans in Arlo's name. In 1985, over Labor Day weekend, when Arlo was 22 years old, Russell kicked him off the farm without warning. Arlo left with nothing but his pickup and the clothes on his

back. At trial, Arlo testified that he thought Russell made him leave because Arlo had proposed to his girlfriend. With the farm operation loans still in his name and having little capacity to make the payments, Arlo had to sue his father for the money to satisfy the debt. Arlo continued to live in the area and attempted to reach out to Russell on two occasions, once standing next to him at a funeral and, in another instance, parking his own antique car next to Russell's at a parade. Russell refused to acknowledge him on either occasion. Accordingly, Arlo had little contact with Russell after 1986.

[¶5.]　　　Around the time Russell kicked Arlo off the farm, Renny, who was then 17 years old, moved to the farm to help his father. Renny testified that his father was distrustful of banks and paranoid, keeping guns all over the house including above the doors, under his pillow, in the bathroom, mounted under the kitchen table, and in his vehicles. He also kept large amounts of cash in the house. Russell was prone to fits of rage and would scream and throw things when angry. Around 1995, Russell built a new shop where he continued to rebuild and restore antique cars. Within the shop, Russell built a small apartment-like unit, which he moved into full time. Through the years, Russell made comments to Renny referencing the quarters of land he had picked out for each child. Arlo was to receive the quarter across the road, and Renny was to get the quarter that was inherited from his grandfather.

[¶6.]　　　By the late 1990s, several neighbors, including Jason Bender and Boyd Hagenson, started to frequent the shop to play cards in the evening. Around this same time, Bender could often be found at Russell's shop. Renny testified that

during this time it became harder to talk to and reason with Russell and that Bender was with him "more and more."

[¶7.]        Jean Cole, who worked for First State Bank from 1988 to 2014, testified that she had frequent contact with Russell as a bank customer. In the early years, she described him as confident and knowing his business. As the years progressed, he seemed a "little more confused on why he was there and what he was going to be doing." He once told her that "maybe his mind wasn't clicking like he wanted it to be." Cole testified that by 1998, Hagenson often accompanied Russell and would peer over his shoulder watching him intently. Russell took out tens of thousands of dollars in cash which he subsequently buried in various locations on his farm. Cole testified that, as time went on, she could tell Russell was confused.

[¶8.]        Renny continued to live and work on the farm until 2001, when Russell abruptly told Renny he had to leave. Jerry Smith, a family acquaintance, testified that he was at a card game at Russell's shop a few months before Russell kicked Renny off the farm. Smith testified that Bender and his wife Tammy, a financial advisor, were also present. During the card game, a general conversation started in which everyone began making negative remarks about Renny, which lasted the entire evening. Outraged by this conversation, Smith left the shop because, in his view, Renny was not the type of guy who deserved it. After Renny was kicked off the farm, Smith tried to intervene with Russell, but he was unwilling to change his mind. Smith described Russell as distrustful of others, often believing he had been "screwed" by people. He also stated that Russell never forgot someone who had done him wrong. After getting ejected from the farm, Renny rented and farmed a

place nearby and got a job selling seed. Meanwhile, Russell let his tillable acres lay fallow, resulting in "hundreds of acres of weeds . . . close to eight, nine feet tall[.]" Through the years, Renny would continue to have occasional interactions with Russell.

[¶9.]        Sherri and Gina left Britton after high school. Gina moved to the Minneapolis area but made frequent trips home throughout her twenties. The trips became less frequent as her career and family grew and she moved farther away from Britton. She testified that her father refused to interact with her and she had not spoken to him since 1993. Sherri left Britton in 1982 and settled in Arizona. Sherri continued to visit her father at least six times between 1995 and 2001. Sherri testified that she last saw her father during the summer of 2004, and she could tell that he was getting weaker mentally and physically. Both daughters testified about how they had continued their attempts to foster a relationship with their father through the years by sending him letters, cards, and invitations to special events. But Russell never responded.

[¶10.]       With the farmland lying fallow, in 2002, Bender began leasing Russell's land for $50 an acre, which at the time was close to market value. Two months later, Russell also began investing funds with Edward Jones through Bender's wife. Bender continued to lease Russell's land up until Russell's death in 2016. The price never exceeded $50 an acre, despite the market rental value increasing to around $200 an acre over the course of the next ten years. Bender acknowledged the rate was far below market value but insisted that Russell refused to accept more per acre.

[¶11.]     As the years passed, Bender and Russell grew closer, and Bender provided him with more assistance. Bender bought a Model A car which he worked on in Russell's shop. He also mowed his lawn, sprayed around the outbuildings, cut wood, and stocked meat in Russell's freezer. Bender testified that he would bring his little girls to Russell's shop and let them run around while he and Russell tinkered with cars. Bender also testified about how he would assist Russell in more significant ways, such as accompanying him on trips to Ohio where he visited friends, taking him to Rapid City to visit his brother's memorial, and burying his dog Whitey after he had to put it down.

[¶12.]     Several neighbors testified that it was often difficult for them to be alone with Russell. Ben Waldner, a long-time friend from the Hutterite colony, testified that it appeared to him that Hagenson did not want him to be alone with Russell. Darin Roehr, a family friend, also testified that Hagenson, another neighbor of Russell's, was controlling and would come out of the shop if he came to visit Russell. Waldner also noticed photographs of children on Russell's refrigerator and, when asked, Russell told him Bender or Hagenson put them there and he did not know who was depicted in the pictures.

[¶13.]     In a little over a decade, Russell executed three wills applicable to this appeal. The first will was prepared by attorney Tom Sannes and executed in 2001. In preparing this first will, Russell told Sannes that he wanted to disinherit his three youngest children and leave everything to his daughter Sherri. Foreseeing litigation, Sannes required Russell to receive a competency evaluation from a local physician before drafting his will. The physician examined Russell and sent Sannes

a letter confirming Russell was mentally competent. Sannes then drafted and Russell executed the 2001 will, which gave Sherri all his real property, valued at approximately $3.5 million, and left several vintage vehicles to a friend.

[¶14.] The second will, executed in October 2004, disinherited Sherri and named Bender as the primary beneficiary. Russell told Sannes that he wanted to remove Sherri and replace her with Bender. Russell told Sannes that Sherri did not come to see him anymore, even though, unbeknownst to Sannes, Sherri had visited him just two months earlier. At trial, Sannes testified that he had no impression that Bender encouraged or was directly involved in Russell's decision to change his will. Russell told Sannes that Bender was a good guy who did not know of his plans. He also conveyed that Bender was in the hospital recovering from a motorcycle accident and that he had been visiting him. Sannes stated that Russell clearly expressed his wishes and fully understood what he was requesting. Under the 2004 will, Russell left all of his property to Bender except for the same vintage vehicles which he left to friends, including Hagenson.

[¶15.] In 2009, Russell directed Sannes to draft a durable power of attorney and health care power of attorney naming Bender as his attorney-in-fact with Bender's wife as the alternate. Sannes testified that there was no indication of pressure to execute the powers of attorney.

[¶16.] Russell made his third and final will in 2012. On November 9, Russell visited Sannes intending to make changes to his will. Sannes testified that he advised Russell not to make any changes. At the time, it appeared Russell heeded Sannes's advice. However, a month later, Russell sought attorney Kari Bartling's

services to draft a new will. Russell told Bartling that he was angry with Sannes because Sannes had changed and was now against him. Bartling agreed to draft Russell's third will, which revoked all prior wills and named Bender as the sole beneficiary and personal representative of Russell's estate. Again, the will specifically disinherited Russell's four children. Bartling testified that she had no hesitation about Russell's ability to understand his request, so she proceeded to draft the will without ordering a competency evaluation. Bartling also acknowledged that she would have required Russell to see a doctor before drafting the will if she was aware of a diagnosis indicating cognitive decline or delusion disorder.

[¶17.]     During her testimony, Bartling was shown two exhibits of codicils handwritten by Bender two weeks after Russell executed his 2012 will with Bartling. The codicils purported to give John Beaner, Bender's old college roommate, and Hagenson six of Russell's vehicles and $100,000 cash. Bartling testified that because all property was bequeathed to Bender in the 2012 will, she was unaware of any circumstances that would make Russell change his mind about the division of his property within two weeks of drafting a new will. Bartling also acknowledged that the codicils were invalid because they were in Bender's handwriting, not Russell's.

[¶18.]     Russell died on May 25, 2016, at age 84. Upon Russell's death, Bender offered the 2012 will into probate on June 6, 2016, as Russell's last will and testament. Soon after, Russell's children (Contestants) petitioned, challenging the will on the grounds of undue influence, lack of testamentary capacity, and insane

delusion. In 2018, Bender moved for summary judgment on the Contestants' petition. The circuit court granted Bender's motion, concluding that Russell did not lack testamentary capacity, did not suffer from insane delusion, and there was no evidence supporting a claim of undue influence. Contestants appealed all three grounds the circuit court relied upon in granting summary judgment.

[¶19.]     This Court reversed the circuit court's decision regarding Sherri's claim for undue influence. *In re Estate of Tank (Tank I)*, 2020 S.D. 2, 938 N.W.2d 449. This Court determined that summary judgment was not appropriate because of the existence of issues of material fact regarding "Russell's decision to give nearly all his property to Sherri in the 2001 will and then disinherit her completely in the 2004 will, just three years later." *Id.* ¶ 44, 938 N.W.2d at 461. Relying on *In re Blake's Estate*, 136 N.W.2d 242, 247 (S.D. 1965), Bender argued that the consistency between the 2004 and 2012 wills strongly negates the existence of undue influence. This Court acknowledged that the similarity between the two wills would be relevant information for a fact finder to consider but would not in and of itself be determinative of the issue of undue influence. *See Tank I*, 2020 S.D. 2, ¶ 44, 938 N.W.2d at 461. Sherri claimed that the 2012 will was the result of a continued multi-year undue influence scheme that pervaded the 2004 will. After remand, the parties engaged in pretrial proceedings including Bender's motion in limine which the court granted, in part, excluding nearly all testimony of events occurring after 2012.[1]

---

1.     Some of the testimony referenced in paragraph 42 of *Tank I* was excluded as irrelevant, including evidence that Russell gave Bender a large amount of

(continued . . .)

[¶20.]    The circuit court conducted a four-day jury trial on Sherri's undue influence claim. Sherri called sixteen witnesses, including Dr. Rodney Swenson, a neuropsychologist, who testified that in his opinion Russell was cognitively impaired and subject to undue influence. In preparation for his testimony regarding Russell's cognitive abilities, he reviewed Russell's medical records, brain MRIs taken in 2003 and 2010, and the depositions of the witnesses. In Dr. Swenson's opinion, Russell was mentally ill, suffering from vascular dementia, persistent delusional disorder, and paranoia, leaving him vulnerable to manipulation and undue influence.

[¶21.]    Dr. Swenson also described the characteristics of "influencers" who use their relationships with a vulnerable person to "embed themselves with the person and start the process of . . . predator[y] behavior." Such "influencers" often feel they are entitled "to what they're getting from this person even though it is out of proportion to what they should get." Dr. Swenson explained that a mentally ill person like Russell could be effectively manipulated by playing along "with their delusional disorder" without confronting them or rocking the boat. In Dr. Swenson's opinion, Russell was susceptible to undue influence by Bender.

---

(. . . continued)

cash in 2009 for safekeeping; that after Russell was placed in a nursing home in 2015, Bender dug up his cash and put it in a safe which he did not inventory or reveal until after Russell's death; and that after Bender had access to Russell's cash, he bought a tractor from a neighbor, paying for it with cash that smelled so moldy that the neighbor had to store it outside to let it air out. The circuit court also precluded testimony regarding Bender's name being added to Russell's bank accounts, to a sizeable annuity held by Bender's wife, and testimony regarding Hagenson, who spent significant time with Russell and accompanied him to the bank in 2013 when he made a large cash withdrawal.

[¶22.]     At trial, Bender testified extensively and called five witnesses including his own expert, Dr. David Travel, a professor of neurology. Dr. Travel testified that in his opinion Russell was an eccentric but competent, cognitively intact person who was stubborn and not susceptible to undue influence. After four hours of deliberation, the jury unanimously concluded that the 2012 will disinheriting Sherri and naming Bender as the beneficiary was the product of undue influence.

[¶23.]     After trial, Bender filed a renewed motion for judgment as a matter of law and, in the alternative, a motion for a new trial. At a hearing on these motions, the circuit court vacated the jury's verdict and granted Bender's motion for judgment as a matter of law and, alternatively, his motion for a new trial. Sherri appeals, raising several issues which we consolidate and restate as follows:

1.     Whether the circuit court erred by granting a renewed post-verdict motion for judgment as a matter of law (Rule 50(b)) on grounds that were not earlier advanced in the motion made during trial per Rule 50(a).

2.     Whether the circuit court erred by vacating the jury's verdict on grounds that there was insufficient evidence to establish the elements of Sherri's undue influence claim.

3.     Whether the circuit court erred by granting, in the alternative, a new trial on grounds that there was insufficient evidence to support the jury's verdict.

4.     Whether Sherri is entitled to post-trial relief, including an order reinstating the verdict, removing Bender as personal representative, and requiring him to repay the attorney fees awarded by the circuit court.

**Analysis and Decision**

*Renewed Motion for Judgment as a Matter of Law*

[¶24.] At the end of her case-in-chief, Sherri moved for judgment as a matter of law under SDCL 15-6-50(a) on each element of undue influence, arguing that no reasonable juror could differ on whether the elements had been proven. Aside from opposing Sherri's motion, Bender made his own motion for judgment as a matter of law. Bender argued,

> I think there is sufficient evidence to take the case to the jury with regard to *the first three elements of the undue influence* test. However, that's *not the case for the fourth element. . . .* Based on the evidence presented, there's no way a reasonable jury could conclude that the 2012 will . . . clearly shows the effects of undue influence.

The circuit court denied both parties' motions stating,

> [this court] doesn't believe that the Supreme Court sent [the case] back to the circuit court level to - - only have the court turn around and then take it away from the jury. This court isn't being asked to be the final decision maker, that's for the jury to decide. . . I believe the direction from the Supreme Court was to come back and have the jury listen to the facts and make the decision. So that's what this court intends to do.

[¶25.] At the close of evidence, Sherri renewed her motion. The circuit court asked Bender's counsel, "do you wish to renew your motion," to which he responded, "Yes, your Honor. Do you want me to talk for half an hour or just renew it." He then said only that he was renewing the earlier motion. The court denied both motions on the grounds previously expressed. After the jury returned a verdict for Sherri, Bender filed a post-verdict motion for judgment as a matter of law under SDCL 15-6-50(b) (Rule 50(b)), previously called a motion for judgment notwithstanding the verdict. Bender's motion conceded the second element of

undue influence, the opportunity to influence, but argued that Sherri failed to present sufficient evidence at trial to support finding elements one, three, and four of undue influence, namely, that Russell was susceptible to being influenced, that Bender had a disposition to exert influence for an improper purpose, and that the result is one that clearly shows the effects of undue influence. The circuit court granted Bender's motion after holding a hearing on the matter on September 8, 2020.

[¶26.] On appeal, Sherri argues that the circuit court committed two errors related to Bender's Rule 50(b) motion. First, Sherri argues the court erred by considering and granting Bender's Rule 50(b) motion on different grounds than what was included in his Rule 50(a) motion. Second, Sherri argues that the court erred by granting Bender's Rule 50(b) motion based on insufficient evidence supporting the jury's verdict. We address each issue in turn.

> ***a.*** ***Whether the circuit court erred by granting a renewed post-verdict motion for judgment as a matter of law (Rule 50(b)) on grounds that were not earlier advanced in the motion made during trial per Rule 50(a).***

[¶27.] Sherri contends that Bender's original motion for judgment as a matter of law was limited to the fourth element of undue influence. To support her argument, Sherri points to Bender's language at trial, "I think there is sufficient evidence to take the case to the jury with regard to the first three elements of the undue influence test. However, that's not the case for the fourth element." Sherri argues that by conceding that there was sufficient evidence to send the first three elements to the jury, Bender's original motion for judgment as a matter of law is

limited to the fourth element. Sherri therefore argues that Bender's renewed motion for judgment as a matter of law was overbroad because it included elements one and three, which were not included in his original motion.

[¶28.] Bender contends that Sherri waived this argument by failing to object at the time the Rule 50(b) motion was filed or at the September motions hearing. Bender also argues that this Court "has the authority to set aside and ignore procedural defects" should this Court determine that an overly broad renewed motion for judgment as a matter of law constitutes such a defect.

[¶29.] We start with Bender's argument that Sherri waived the Rule 50(b) issue on appeal because, if successful, that argument could resolve Sherri's first issue. Under SDCL 15-6-50(b), "[i]f, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of evidence . . . [t]he movant may *renew its request for judgment as a matter of law* by filing a motion no later than ten days after notice of entry of judgment." (Emphasis added.) "A [Rule 50(b)] motion. . . is based on and relates back to [the prior Rule 50(a) motion] made at the close of evidence. Thus, the grounds asserted in support of the [earlier, pre-verdict motion] are brought before the trial court for a second review." *United States v. State*, 1999 S.D. 94, ¶ 7, 598 N.W.2d 208, 211 (citations omitted).

[¶30.] "A court reviewing a Rule 50(b) motion is limited to consideration of only those grounds advanced in the original, Rule 50(a) motion." *Nassar v. Jackson*, 779 F.3d 547, 551 (8th Cir. 2015).[2] "[A] post-trial motion for judgment 'may not

---

2.      South Dakota's Rule 50(b) is modeled after the Federal Rules of Civil Procedure Rule 50(b). *See Harmon v. Washburn*, 2008 S.D. 42, ¶ 10, 751

(continued . . .)

advance additional grounds that were not raised in the pre-verdict motion.'"

*Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co.*, 381 F.3d 811, 821 (8th Cir. 2004) (quoting *Walsh v. Nat'l Comput. Sys.*, 332 F.3d 1150, 1158 (8th Cir. 2003)). This is because "the Rule 50(b) motion is only a renewal of the pre-verdict motion [and] it can be granted only on grounds advanced in the pre-verdict motion." Fed. R. Civ. P. 50(b) advisory comm. notes to 2006 amendment.

[¶31.]    Rule 50(b), however, must be applied in conjunction with our rules regarding waiver and failure to preserve issues for appeal.

> Ordinarily an issue not raised before the trial court will not be reviewed at the appellate level. The trial court must be given an opportunity to correct any claimed error before we will review it on appeal. To preserve issues for appellate review litigants must make known to trial courts the action they seek to achieve or object to the actions of the court, giving their reasons. Failing to raise an issue, thereby [not] allowing the circuit court an opportunity to correct the claimed error, results in waiver of the issue.

*In re M.D.D.*, 2009 S.D. 94, ¶ 11, 774 N.W.2d 793, 796–97 (quoting *State v. Gard*, 2007 S.D. 117, ¶ 15, 742 N.W.2d 257, 261); This rule applies with equal force to Rule 50(a) and Rule 50(b). An appellant's "challenge to a[n] [appellee's] failure to adhere to the procedural prerequisites of Rule 50(a) and (b) is waivable." *Wallace v. McGlothan*, 606 F.3d 410, 419 (7th Cir. 2010) (citing *Collins v. Illinois*, 830 F.2d 692, 698 (7th Cir. 1987)). If a party believes opposing counsel's Rule 50(b) motion exceeds the grounds stated in counsel's Rule 50(a) motion, the issue should be

---

(. . . continued)

N.W.2d 297, 300; *see also* Fed. R. Civ. P. 50(b) advisory comm. notes to 2006 amendment. This Court has recognized that federal court decisions can assist our efforts to interpret our corresponding rules. *Abdulrazzak v. S.D. Bd. of Pardons and Paroles*, 2020 S.D. 10, ¶ 40 n.6, 940 N.W.2d 672, 682 n.6.

brought first to the circuit court's attention, so they may determine whether the grounds asserted were proper. *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010). "[If] a party fails to raise the inadequacy . . . that party is precluded from raising the issue on appeal." *Id.* at 1243 (citation omitted).

[¶32.]       Here, Bender's post-verdict Rule 50(b) motion included new grounds not previously advanced in his Rule 50(a) motion. In his Rule 50(a) motion, Bender specifically stated, "I think there is sufficient evidence to take the case to the jury with regard to the first three elements of the undue influence test. However, that's not the case for the fourth element." Yet, after trial, Bender filed a post-verdict Rule 50(b) motion that challenged the sufficiency of the evidence on elements one, three, and four. Bender filed his post-verdict Rule 50(b) motion and his supporting brief with the circuit court on August 24, 2021. Sherri filed her responsive brief, opposing Bender's motion, with the circuit court on August 31, 2021. Sherri's brief failed to raise the issue that Bender's Rule 50(b) motion was overly broad and included grounds not previously raised in his Rule 50(a) motion. Moreover, Sherri never addressed the issue during the circuit court's September motions hearing. Because Sherri failed to raise the issue before the circuit court, despite having ample opportunity to do so, we determine that Sherri waived the argument that Bender's Rule 50(b) motion was overbroad.

[¶33.]       In addition, Sherri argues that the statement made by Bender's counsel acknowledging there was sufficient evidence to submit the first three elements to the jury constitutes an admission, citing *Tunender v. Minnaert* for the proposition that "counsel admissions 'may occur at any point during the litigation

process.'" 1997 S.D. 62, ¶ 35, 563 N.W.2d 849, 856 (quoting *Kohne v. Yost*, 818 P.2d 360, 362 (Mont. 1991)). Bender contends that his attorney's comments amounted to an opinion rather than a substitution of evidence constituting a judicial admission.

[¶34.] This Court defines a judicial admission as "a formal act of a party or his attorney in court, dispensing with proof of a fact claimed to be true, and is used as a substitute for legal evidence at trial." *Id.* ¶ 21, 563 N.W.2d at 853 (quoting *Harmon v. Christy Lumber, Inc.*, 402 N.W.2d 690, 692–93 (S.D. 1987)); *Judicial Admission*, Black's Law Dictionary (11th ed. 2019)("A formal waiver of proof that relieves an opposing party from having to prove the admitted fact and bars the party who made the admission from disputing it."). Although the statements by Bender's attorney acknowledged the existence of some evidence, his statements cannot be equated to an admission. Counsel's comments were made outside the presence of the jury and did not function to relieve Sherri's burden to present evidence regarding the first three elements of undue influence. Therefore, this Court determines that Bender's attorney's statements do not equate to a judicial admission.

> **b.** **Whether the circuit court erred by vacating the jury's verdict on grounds that there was insufficient evidence to establish elements three and four of Sherri's undue influence claim.**

[¶35.] An individual may contest a testamentary document on the grounds that it was unduly influenced by another. "For influence to be undue, it must be of such a character as to destroy the free agency of the testator and substitute the will of another for that of the testat[or]." *In re Estate of Pringle*, 2008 S.D. 38, ¶ 44, 751 N.W.2d 277, 291 (alteration in original) (quoting *In re Estate of Schnell*, 2004 S.D.

80, ¶ 21, 683 N.W.2d 415, 421). "The contestant of a testamentary document bears the burden of 'proving each of the four elements of undue influence by the greater weight of the evidence.'" *In re Estate of Gaaskjolen*, 2020 S.D. 17, ¶ 28, 941 N.W.2d 808, 816 (quoting *Pringle*, 2008 S.D. 38, ¶ 44, 751 N.W.2d at 291). The elements necessary to prove an undue influence claim are: "(1) the decedent's susceptibility to undue influence; (2) opportunity to exert such influence and effect the wrongful purpose; (3) a disposition to do so for an improper purpose; and (4) a result showing the effects of such influence." *Id.* (quoting *Pringle*, 2008 S.D. 38, ¶ 44, 751 N.W.2d at 291).

[¶36.] In granting Bender's post-verdict motion for judgment as a matter of law, the circuit court vacated the jury's verdict, reasoning that insufficient evidence was presented for rational minds to differ on elements three and four. As to element three, the circuit court found "the evidence there was non-existent." On element four, the circuit court determined that the evidence establishing "a result clearly showing the effect of undue influence . . . was lacking."

[¶37.] Sherri argues that she "presented 'substantial evidence' on all four elements of undue influence," and the circuit court's decision stemmed from several errors, such as discounting much of her evidence, giving weight to Bender's testimony, ignoring inferences favoring the verdict, and attributing the jury's verdict to "passion" or "sympathy."

[¶38.] This Court reviews a circuit court's grant or denial of a motion for judgment as a matter of law de novo. *Ctr. of Life Church v. Nelson*, 2018 S.D. 42, ¶ 18, 913 N.W.2d 105, 110 (citing *Magner v. Brinkman*, 2016 S.D. 50, ¶¶ 11–13, 883

N.W.2d 74, 80–81). "And because our review is de novo, we give no deference to the circuit court's decision." *Id.* ¶ 18, 913 N.W.2d at 110 (quoting *Steineke v. Delzer*, 2011 S.D. 96, ¶ 7, 807 N.W.2d 629, 631).

[¶39.] "Ultimately, we apply the same standard as the circuit court: we view the evidence in the light most favorable to the verdict or to the nonmoving party. Then, '[w]ithout weighing the evidence, the court must . . . decide if there is evidence that supports [the] verdict.'" *Id.* ¶ 18, 913 N.W.2d at 110 (alteration in original) (citation omitted) (quoting *Magner*, 2016 S.D. 50, ¶ 14, 883 N.W.2d at 81). "If sufficient evidence exists so that reasonable minds could differ, judgment as a matter of law is not appropriate." *Id.* (quoting *Magner*, 2016 S.D. 50, ¶ 14, 883 N.W.2d at 81). As explained in *Klarenbeek v. Campbell*, 299 N.W.2d 580, 581 (S.D. 1980), a Rule 50(a) motion, which is renewed by the Rule 50(b) motion, should be granted only when the evidence is so one-sided that reasonable minds can reach no other conclusion. "In our review of the sufficiency of the evidence supporting a jury verdict, 'we are not to speculate or query how we would have viewed the evidence and testimony, or what verdict we would have rendered had we been the jury.'" *Wright v. Temple*, 2021 S.D. 15, ¶ 28, 956 N.W.2d 436, 446 (quoting *Knecht v. Evridge*, 2020 S.D. 9, ¶ 37, 940 N.W.2d 318, 329). Rather it is the jury's responsibility, as the ultimate trier of fact, to "weigh the conflicting evidence or decide upon the credibility of the witnesses." *Id.* ¶ 37, 956 N.W.2d at 448 (citation omitted). Lastly, a jury's verdict should be affirmed if it can be explained with reference to the evidence, "rather than passion, prejudice, or mistake of law." *Id.* ¶ 34, 956 N.W.2d at 447–48 (citation omitted).

[¶40.] This Court will first look to whether sufficient evidence exists to support the jury's verdict that Bender had a disposition to influence Russell for an improper purpose. A disposition to unduly influence for an improper purpose "is 'evident from persistent efforts to gain control and possession of the testator's property.'" *Gaaskjolen*, 2020 S.D. 17, ¶ 33, 941 N.W.2d at 817 (quoting *In re Estate of Borsch*, 353 N.W.2d 346, 350 (S.D. 1984)). This Court has noted that keeping transactions secret and leasing land for less than fair market value may be evidence of a disposition to influence for an improper purpose. *See Neugebauer v. Neugebauer*, 2011 S.D. 64, ¶¶ 23–24, 804 N.W.2d 450, 456.

[¶41.] Here, the trial record contains sufficient evidence to support a jury finding that Bender had a disposition to influence Russell for an improper purpose. Throughout the trial, the jury heard testimony from several witnesses describing Russell's lack of trust in banks. Jean Cole testified that Russell "took a lot of cash. He always took a lot of cash. . . He would ask how much he could take before the government would have to know." At the time of his death, Russell had buried approximately $150,000 in various locations around his property. Bender, whom Sherri called as an adverse witness, testified that, after he learned of the cash and its different locations, he created a map for two reasons: "One, I didn't want to forget what he told me. And two, if something happened to me. . . [the cash] doesn't get lost in time." Yet, when asked, Bender acknowledged that he did not tell anyone else about the map or cash. Further, he agreed that the map contained neither a label, nor any information that would allow a third-party to discern its significance.

[¶42.]     Aside from the large amount of cash, which only Bender knew was buried on the property, Bender had a significant financial stake in retaining his below market leases for Russell's land. Starting in 2002, Bender began leasing Russell's land for $50 an acre. The jury heard evidence that in 2002 the average rental rate was $52.60 an acre. Bender testified that the below market rate reflected a lack of productivity resulting from Russell letting his land lie fallow in 2001, after he kicked Renny off the farm. However, even as the land returned to its previously productive state, Bender continued to pay $50 an acre until Russell's death in 2016. By then, the market rental rate for farmland had increased by a factor of four to approximately $200 an acre. Bender claimed that he talked to Russell about increasing the rental rate and that Russell always rebuffed his suggestions to increase the amount. Bender also testified that he kept the rental rate secret, asserting the lease amount was between Russell and himself. But Bender later stated that he discussed the rental rate with Russell in the presence of his old college roommate and a friend. When asked why he never talked about the low rental rate with Renny or why he did not bring Renny along to witness the signing of the yearly lease, Bender acknowledged that he "had a financial incentive not to tell Renny." Bender admitted that talking to Renny about the lease or including him could have led to Renny's reconciliation with Russell which may have resulted in Renny leasing the land.

[¶43.]     Eventually, Bender approached Russell about buying the land, to which Russell said he would need to consider the capital gains tax. After a period of not hearing anything, Bender followed up with Russell. Russell said he would not

sell because he did not want "to pay that much in capital gains tax." Bender testified that he asked Russell if there was "another way instead, that we can mitigate these taxes, I'd really like to buy this land."

[¶44.] Other evidence relevant to this issue included testimony that within weeks of Bender leasing Russell's land, Russell started investing with Bender's wife at Edward Jones. By the end of 2012, Russell had invested over $117,000. Considering the extensive testimony describing Russell's distrust for banks to the degree that he withdrew and buried large amounts of cash and the reduced rental rate paid by Bender, the jury could have reasonably inferred that Bender had a disposition to wrongfully influence Russell.

[¶45.] Furthermore, the jury is uniquely charged with assessing the credibility and demeanor of the witnesses. Bender testified twice, describing in extensive detail his relationship with Russell. When asked, Bender steadfastly denied ever telling a lie throughout his life—even a white lie. And Bender denied even having the *opportunity* to influence Russell, a point his counsel conceded, despite spending hundreds of hours at his shop and ingratiating himself with Russell through the years. Bender also denied that Russell showed *any* signs of mental illness, cognitive decline, or susceptibility to influence, despite testimony from two experts establishing that Russell had, at least, some deficits.[3] The jury, in

---

3. There was conflicting testimony with respect to Russell's mental health. Dr. Swenson testified that Russell was mentally ill and highly susceptible to being influenced and manipulated by others. He described certain characteristics identified in the scientific literature as common among influencers, some of which fit Bender's profile. Dr. Travel, who was rigorously cross-examined, disagreed that Russell had pervasive delusional

(continued . . .)

its prerogative, may have discounted Bender's testimony or rejected it completely, finding more persuasive the testimony that Bender unduly isolated, manipulated, and influenced Russell in the disposition of his estate.

[¶46.]     Based on our review of the trial testimony, there was sufficient evidence in the record to allow rational minds to differ as to whether Bender had a disposition to influence Russell for an improper purpose.  Accordingly, the circuit court erred by concluding that the evidence on this element "was non-existent."

[¶47.]     We turn next to whether there was sufficient evidence for a reasonable jury to find that Russell's 2012 will clearly shows the effects of undue influence.  In reviewing the evidence, this Court keeps in mind that "[i]t is within the province of the jury as the ultimate trier of fact to weigh conflicting evidence and decide upon the credibility of witnesses." *Wright*, 2021 S.D. 15, ¶ 37, 956 N.W.2d at 448.  So long as sufficient evidence exists so that reasonable minds could differ, judgment as a matter of law on this issue is improper.  *Ctr. of Life Church*, 2018 S.D. 42, ¶ 18, 913 N.W.2d at 110.  A sufficient basis exists unless the evidence is so one-sided that reasonable minds could reach no other conclusion.  *See Klarenbeek*, 299 N.W.2d at 581.  Upon review, this Court will not entertain a party's attempts to relitigate the trial.  *Magner*, 2016 S.D. 50, ¶ 14, 883 N.W.2d at 81.

---

(. . . continued)

disorder or mental illness.  Yet, he acknowledged having previously testified in his deposition that Russell had vascular dementia or Alzheimer's dementia, but then clarified his testimony by stating that Russell's condition was not advanced enough to impair his cognition.  It was ultimately up to the jury to weigh these opinions.

[¶48.] In *Tank I*, this Court determined that summary judgment was not appropriate on Sherri's claim of undue influence because issues of material fact existed on all elements of undue influence. On issue four, this Court stated, "while the consistency between the 2004 and 2012 wills may be relevant, a fact finder could also consider the circumstances involving Russell's decision to give Sherri all his property in 2001 and completely disinherit her in 2004." The fact finder could also consider the circumstances surrounding the execution of the 2012 will, including Bender's attempt to hand draft two codicils giving a large chunk of Russell's property to two of Bender's friends, Beaner and Hagenson.

[¶49.] In *Borsch*, this Court acknowledged that some of the most damaging evidence of a result showing the effect of undue influence are the wills. 353 N.W.2d at 351. And while Bender is correct that the consistency between the 2004 and 2012 will is relevant, the consistency of these wills is just one part of the totality of the circumstances. In previous cases, this Court has acknowledged that circumstantial evidence from the time before and after the execution of a will is relevant to the jury's analysis. *See In re Estate of Nelson*, 330 N.W.2d 151, 155 (S.D. 1983) (stating how it is important to know the testator's mental condition a reasonable amount of time before and after the will's execution). This is especially true when, like here, the beneficiary claims to have had zero knowledge of the testator's will. In such circumstances, an individual with a disposition to exert undue influence is likely to continue exerting influence until they can ensure they have succeeded. Our rule reflects the pernicious nature of undue influence being a special type of theft that begins while the testator is alive and continues until their

death. Based on this, the jury was free to consider all relevant evidence pertaining to the 2001 will, the 2004 will, and the circumstances of the execution of the 2012 will. This Court cannot second guess how the jury balanced this evidence while making its decision, but we do not find that the evidence was so deficient that reasonable minds could not differ as to the outcome.

[¶50.] Additionally, Sherri argues that the circuit court erroneously determined that the jury's verdict rested on passion and sympathy instead of the evidence presented. Upon granting the motion, the circuit court pointed to Sherri's closing arguments as the source for provoking juror sympathy and passion by improperly calling upon the conscience of the community to invalidate the will.[4] Sherri argues that the circuit court erred for two reasons. First, Bender failed to object to Sherri's closing argument at trial; and second, the evidence supports the jury's verdict, so the court should not have reversed based on the court's speculation that the jury was swayed by passion or sympathy.

[¶51.] "There is no doubt that, in the excitement of an argument, counsel do sometimes make statements which are not fully justified by the evidence. . . It is the duty of the [opposing] counsel at once to call the attention of the court to the objectionable remarks, and request his interposition, and, in case of refusal, to note

---

4. Sherri's counsel told the jury in surrebuttal: "You have a chance to send a message to this county. You say, yes, you're going to undo the will and everybody in the future will be on the look-out for things like that. If you say no, it will be pretty easy for people just to kind of ignore the Russell Tanks in the future. That's not the result that this community needs. That's not what a small town would do . . . The Tank family doesn't want your sympathy. Sherri Castro wants you to send a message. The message is, yes, this Will was the product of undue influence and the message is dated the 22nd of July, 2021," referencing the verdict form.

an exception." *Schlagel v. Sokota Hybrid Producers*, 279 N.W.2d 431, 434 (S.D.

1979) (quoting *Crumpton v. United States*, 138 U.S. 361, 364, 11 S. Ct. 355, 356, 34

L. Ed. 958, 960 (1891)).  A party's failure to "object to argument of counsel at trial

. . . deprives the trial court the opportunity to rule on the issue and admonish the

jury or give a curative instruction." *Veith v. O'Brien*, 2007 S.D. 88, ¶ 67, 739

N.W.2d 15, 34 (citing *State v. Janklow*, 2005 S.D. 25, ¶ 47, 693 N.W.2d 685, 701).

"When a party deprives the trial court of an opportunity to rule on the issue by

failing to object to argument at the time the objectionable comments are made, he

waives his right to argue the issue on appeal." *Id.* (citing *Janklow*, 2005 S.D. 25,

¶ 47, 693 N.W.2d at 701).

[¶52.]	Here, Bender failed to object or call the court's attention to the

statements at the time Sherri's attorney made them.  Indeed, his only objection to

the statement occurred in a single sentence in his post-verdict Rule 50(b) motion.

This failure to timely draw the objectionable remarks to the circuit court's attention

deprived the court of the ability to address the objections with a curative instruction

directing the jury not to consider this improper statement by Sherri's counsel.  For

this reason, we conclude that Bender failed to preserve the issue for review.

[¶53.]	Even if Bender had properly preserved the issue, a verdict should be

affirmed if it "can be explained with reference to the evidence, rather than by

passion, prejudice, or mistake of law." *Wright*, 2021 S.D. 15, ¶ 34, 956 N.W.2d at

447–48 (quoting *Morrison v. Mineral Palace Ltd. P'ship*, 1999 S.D. 145, ¶ 14, 693

N.W.2d 193, 197).  As this Court explained above, the jury's verdict was supported

by sufficient evidence.  Thus, the circuit court erred by vacating the verdict based on

its assumption that the jurors made their decision, not because of the evidence before them, but out of sympathy and passion.

### *Motion for a new trial*

[¶54.]     Along with his motion for a judgment as a matter of law, Bender moved in the alternative for a new trial on the basis of insufficient evidence, which the circuit court granted, also in the alternative.  Sherri appeals, arguing that there was sufficient evidence to support the jury's verdict, and that the court erred in granting a new trial.

[¶55.]     Under SDCL 15-6-50(b), in addition to renewing their motion for judgment as a matter of law, a litigant "may alternatively request a new trial . . . under SDCL 15-6-59."  "A new trial may be granted to all or any of the parties and on all or part of the issues for any of the following causes . . . (6) [i]nsufficiency of the evidence to justify the verdict[.]"  SDCL 15-6-59(a).

[¶56.]     A motion for a new trial is reviewed under an abuse of discretion standard.  *Selle v. Tozser*, 2010 S.D. 64, ¶ 14, 786 N.W.2d 748, 753.  "However, deference to the circuit court is not without its limits."  *Lewis v. Sanford Med. Ctr.*, 2013 S.D. 80, ¶ 16, 840 N.W.2d 662, 666.  No court "may set aside a jury verdict unless it is clearly 'unreasonable, arbitrary, and unsupported by the evidence.'"  *Zahn v. Musick*, 2000 S.D. 26, ¶ 31, 605 N.W.2d 823, 830 (quoting *Kusser v. Feller*, 453 N.W.2d 619, 621 (S.D. 1990)).  "[A] motion for a new trial will not be granted if the jury's verdict can be explained with reference to the evidence, and the evidence is viewed in a light most favorable to the verdict."  *Selle*, 2010 S.D. 64, ¶ 14, 786 N.W.2d at 752–53 (quoting *Alvine Fam. Ltd. P'ship v. Hagemann*, 2010 S.D. 28,

¶ 18, 780 N.W.2d 507, 512). "[I]f competent evidence exists to support the verdict, it will be upheld." *Surgical Inst. of S.D., P.C. v. Sorrell*, 2012 S.D. 48, ¶ 9, 816 N.W.2d 133, 137 (quoting *Baddou v. Hall*, 2008 S.D. 90, ¶ 33, 756 N.W.2d 554, 562).

[¶57.] As this Court addressed above, Sherri presented sufficient evidence to support and explain the jury's verdict. Because there is sufficient evidence in the record to support the jury's verdict, we do not conclude that it was unreasonable or arbitrary. We, therefore, conclude that the circuit court abused its discretion by alternatively granting a new trial based on its view that there was insufficient evidence to support the verdict. Moreover, it is not clear what would change if this matter were retried. In moving for a new trial, Bender did not claim that he was deprived of a fair trial resulting from evidentiary error or deprived of the opportunity to present his case. Rather, it appears Bender presented his best case. He prevailed in his motion to exclude all evidence post-2012, much of which was damaging to his case.[5] Further, Bender testified twice, once for each party, and was successful in having many of his objections sustained at trial. The jury had the opportunity and responsibility to weigh Bender's credibility, demeanor, and the reasonableness of his testimony.

---

5. This evidence included testimony about Hagenson and Bender accompanying Russell to the bank and requesting they be added to a $20,000 cashier's check and Russell's bank account, respectively. Additionally, the court excluded evidence that Bender dug up Russell's cash after he was placed in a nursing home and failed to inventory or account for it until sometime after Russell's death.

### *Motion to Remove Personal Representative*

[¶58.]        Following the jury's verdict, Sherri motioned to remove Bender as personal representative.  Consistent with the circuit court's decision to grant Bender's motion and vacate the jury's verdict, the court denied Sherri's motion. Sherri now argues on appeal that Bender should not continue as personal representative because he unduly influenced Russell's will and proceeded to defend the will in bad faith.

[¶59.]        The decision to remove an individual as a personal representative is reviewed for abuse of discretion.  *See In re Estate of Unke*, 1998 S.D. 94, ¶ 29, 583 N.W.2d 145, 150.  In light of our conclusion that there was sufficient evidence to support the jury's verdict that Bender unduly influenced Russell's will, it would be unsuitable for Bender to continue to serve as personal representative for Russell's estate.  Therefore, we remand for an order removing Bender from serving as personal representative of Russell's estate.

### *Motion for Intestacy*

[¶60.]        After the jury's verdict, Sherri submitted a proposed order declaring Russell intestate.  In response, "Bender sought to 're-offer' Russell's 2004 will."  The circuit court refrained from ruling on Sherri's proposed order, concluding the issue was moot after it granted Bender's renewed motion for judgment as a matter of law. On appeal, Sherri argues that Bender's attempt to offer the 2004 will following the jury's verdict should be prohibited for two reasons: first, Bender has waited five years to assert the validity of this will, exceeding the permissible statute of limitations period; second, Bender waived the argument by removing the 2004 will

from a 2016 responsive pleading and subsequently communicating to counsel that he was not pursuing that argument. In response, Bender argues that a trial court should be given the opportunity to rule on the matter before the issue is reviewed by this Court. We agree. Because the circuit court has not had the opportunity to consider these claims, we conclude the issue is not properly before this Court for review.

### *Motion for Attorney Fees*

[¶61.] Under SDCL 29A-3-720, "[a]ny personal representative or person nominated as personal representative who defends or prosecutes any proceeding in *good faith, whether successful or not*, is entitled to receive from the estate necessary expenses and disbursements including reasonable attorney's fees." (Emphasis added.) Sherri argues that Bender is not entitled to receive attorney's fees from the estate because he was not acting in good faith by defending a will he unduly influenced. Bender contends that he was acting in good faith, and he is entitled to attorney's fees because the statute allows for fees, irrespective of success.

[¶62.] This Court reviews an award of fees under SDCL 29A-3-720 for an abuse of discretion. *See In re Estate of Finch*, 2017 S.D. 15, ¶ 20, 893 N.W.2d 783, 788. Here, the circuit court approved the personal representative's request for attorney fees after overturning the jury's determination that the 2012 will was unduly influenced and admitting the 2012 will for probate. The circuit court was not presented with the question whether any fees may be awarded to the personal representative after his unsuccessful attempt to defend the 2012 will. Given the Court's ruling in this appeal reinstating the jury's verdict, we vacate the existing

order approving these fees. However, in accord with our decision to remand to the circuit court the question of whether to declare Russell intestate or allow another will to be offered for probate, we likewise remand the matter of whether the prior personal representative is entitled to any of the requested attorney fees.

[¶63.] We reverse, reinstate the jury's verdict, and remand for proceedings and an order consistent with this opinion.

[¶64.] JENSEN, Chief Justice, and SALTER and DEVANEY, Justices, and KNOFF, Circuit Court Judge, concur.

[¶65.] KNOFF, Circuit Court Judge, sitting for MYREN, Justice, who deemed himself disqualified and did not participate.